In the
United States Court of Appeals
For the Seventh Circuit

No. 00-4271

Karen Horwitz,

Plaintiff-Appellant,

v.

Board of Education of Avoca School District
No. 37, John W. Sloan, Venette Biancalana,
and Dorothy Ballantyne,

Defendants-Appellees.

Appeal from the United States District Court
for the Northen District of Illinois, Eastern Division.
No. 98 C 6490--George W. Lindberg, Judge.

Argued June 8, 2001--Decided July 26, 2001

  Before Flaum, Chief Judge, and Bauer and
Kanne, Circuit Judges.

  Flaum, Chief Judge.  Karen Horwitz began
teaching full time at Avoca West
Elementary School when the 1993 to 1994
school year began and continued to do so
until she was terminated in April of
1999. Horwitz has raised numerous claims
against the Board of Education of Avoca
School District No. 37 (the "Board"), Dr.
John W. Sloan, Dr. Venette Biancalana,
and Dorothy Ballantyne. She is appealing
a variety of decisions made by the
district court that resulted in her case
not culminating in a trial. For the
reasons stated herein, we affirm.

I.  Background

  The Board hired Horwitz for the 1993 to
1994 school year, when she was 48 years
old, to teach the fourth grade.
Ballantyne at all times relevant to this
case was president of the Board.
Horwitz's relationship with the school
principal--Dr. Biancalana--and district
superintendent--Dr. Sloan--was apparently
good throughout her first year at Avoca
West. During Horwitz's second year, 1994
to 1995, the parents of at least three
children in Horwitz's class complained
about her. One parent in particular, Mrs.

D., expressed strong dissatisfaction with Horwitz's treatment of her child and subsequently Mrs. D. and Horwitz apparently engaged in a heated conversation over the matter. Nevertheless, Dr. Biancalana and Dr. Sloan recommended in April of 1995 that Horwitz receive tenure. The Board shortly thereafter voted to grant Horwitz, who at the time was 50 years old, tenure. Dr. Biancalana scheduled a meeting with Horwitz on June 7, 1995 to address some of the problems that occurred during the 1994 to 1995 school year, including the incident between Horwitz and Mrs. D; Horwitz abruptly left in the middle of the meeting. The next day, Dr. Biancalana sent Horwitz a letter informing her that her "behavior was an exhibition of gross insubordination" and that gross insubordination can serve as a ground for dismissal. Dr. Biancalana followed up her letter with a memo outlining the various performance problems that she had hoped to discuss during their June 7 meeting. Horwitz subsequently wrote Dr. Biancalana a rebuttal letter explaining that her heart condition contributed to her leaving the meeting suddenly, but she did state, "I admit your allegations that I became highly distressed during the meeting and that I would no longer listen to what you had to say. The reason for my distress was that you were assuming the truth of statements made by other staff members about my behavior while I was speaking on the telephone with [a parent]." More than a year later, in-mid-November of 1996, Horwitz had a meeting with Dr. Sloan, wherein they discussed concerns relating to an election project and Horwitz also recounted incidents where she believed teachers were being discriminated against based on their age. Horwitz alleges that in response to her complaints, Dr. Sloan told her that he would make miserable the life of any person who escalated any issue and that he was good at escalating an issue. The defendants dispute that Dr. Sloan ever made such a comment. On June 16, 1997, Horwitz filed her first charge of age discrimination with the Equal Employment Opportunity Commission ("EEOC").

The 1997 to 1998 school year was no less contentious. Horwitz was reassigned, over her objection, from teaching fourth grade to teaching fifth grade that year. In October of 1997, while the School Board

campaign season was taking place, Horwitz submitted an essay criticizing the school district and its administrators to Wilmette Life. Although the essay was not published in print, it was posted on the internet. Horwitz's essay discussed how school administrators condoned inappropriate actions and encouraged age discrimination. More specifically, she noted that Dr. Sloan "warned" her that he would make miserable the life of anyone who escalated any issues in the district. In January of 1998, Horwitz requested that the Avoca School Board investigate the allegations of wrongdoing that she had asserted in her essay. The Board instead directed Horwitz to engage in mediation with Dr. Sloan and Dr. Biancalana. Horwitz, in a March 9th written response, expressed her unwillingness to partake in mediation. Rather, she demanded the Board pursue an investigation into her complaints concerning the school district, as she believed such an exercise would lead to an admission of wrongdoing on the Board's part and an apology to her. Horwitz stated in her letter to the Board, "Your administrators have psychologically raped me and discriminated against me for over three years and I will not accept anything less than an admission of their harassment along with an apology." The Board did not initiate an investigation as Horwitz demanded, but rather issued its first notice of remedial warning on April 20, 1998 concerning Horwitz's conduct. The notice detailed four areas in which Horwitz needed to improve to avoid dismissal, which included: (1) following the Board's directive to participate in mediation with Dr. Biancalana and Dr. Sloan; (2) cease making false allegations concerning the conduct and actions of Dr. Biancalana, Dr. Sloan, and other school district personnel; (3) behave professionally when dealing with Dr. Biancalana and follow her directives; and (4) work cooperatively with other faculty members, educational support personnel, and outside support staff; cease to engage in "conduct and actions which falsely cast aspersions on the knowledge and abilities of other faculty and staff members;" and raise legitimate concerns in an "appropriate and professional manner." After receiving the notice of remedial warning, Horwitz did comply with the Board's directive to participate in

mediation with Dr. Biancalana and Dr. Sloan.

The end of the 1998 school year brought about another confrontation between Horwitz and the school district. Horwitz did not report to school on April 16, 1998 and her husband in a letter dated the same day informed Dr. Biancalana that she was ill and a doctor advised that she not return to work for a period of time. Her doctors recommended, Mr. Horwitz wrote, that "she remove herself from her extremely hostile work environment which may have a negative impact on her medical condition." He also informed Dr. Biancalana that until Horwitz felt better, she was to have "no contact with any members of the AVOCA School District Staff" and that "lesson plans will have to be completed for her class" during her absence. In late April, Horwitz desired to return to teaching. The school learned through information provided by Horwitz's treating doctor that she had kidney and heart problems and the doctor believed that the extremely hostile working environment at Avoca West was negatively affecting Horwitz's medical condition. Dr. Sloan requested that Horwitz undergo both a physical and psychological exam prior to returning to her teaching position. Horwitz underwent the physical exam and returned to work in May of 1998, as it was agreed that she could complete the psychiatric examination before the next school year began. On June 23, 1998, Horwitz filed a second charge with the EEOC alleging that she had experienced retaliation for filing her initial EEOC charge.

The summer of 1998 was not without some additional tension between Horwitz and the school district. Dr. Biancalana during the summer asked Horwitz to return an audio tape of a conversation between Horwitz, Dr. Biancalana, and the parents of a student. She claimed that the tape needed to be returned because it constituted a confidential student record and that the school district was responsible for maintaining the custody and confidentiality of all copies of the record. By the middle of the summer, July of 1998, Horwitz had not provided the audio tape to the school and had failed to undergo a psychological exam. As a consequence, the Board issued on July 15,

1998, a second notice of remedial warning instructing Horwitz to return all of the audio tapes, as she had returned only one copy of the tape recording, and to undergo the psychological examination that the school district requested. Eventually, Horwitz did undergo the psychological evaluation.

The 1998 to 1999 school year was when the Board dismissed Horwitz. The EEOC sent Horwitz a notice of right to sue, dated September 2, 1998, based on the two charges she filed with them. Horwitz pursued her right to sue by filing a complaint against the Board and various other individuals in the Northern District of Illinois on October 16, 1998. Notwithstanding these events, a third notice of remedial warning was issued by the Board on January 5, 1999, relaying to Horwitz that she needed to remedy certain conduct deficiencies. The notice discussed nine particular issues, ranging from Horwitz's failure to work cooperatively with other faculty and staff to her unwillingness to follow directives put forward by principal Dr. Biancalana. The Board expressed in its notice that it was unhappy with Horwitz's "unprofessional, insubordinate and unsatisfactory conduct," a sentiment the Board had previously articulated in the first and second notices of remedial warning. Horwitz did not report to school on March 16, 1999 and informed Dr. Biancalana in a March 19th letter that she would not be able to teach through at least April 16th due to a medical condition and that a substitute would have to prepare lesson plans after March 22nd. On March 23rd, Dr. Sloan wrote Horwitz a letter requesting that she provide him with certification from her doctor explaining the reason for her absence. At this point in time, Horwitz had accumulated twenty-eight days of sick leave. Dr. Sloan on March 26th and April 6th again asked Horwitz for a doctor's certification. Finally, on April 14th, Horwitz sent Dr. Sloan a letter from her treating physician, Dr. Ciganek. Dr. Sloan, however, wrote another letter to Horwitz explaining that the note from Dr. Ciganek was not sufficient, as it did not adequately explain the medical reason for her absence. Dr. Ciganek did provide the school district with more specific information concerning Horwitz's condition in a letter dated April 22nd.

According to Horwitz, an episode of depression caused her to be absent from school. In late April, Dr. Sloan recommended to the Board that Horwitz be dismissed for her continuing unprofessional and insubordinate behavior. On April 23rd, the Board reviewed Dr. Sloan's recommendation and voted to terminate Horwitz.

At the summary judgment stage, the district court ruled in favor of the defendants on the following claims: (1) Age Discrimination in Employment Act ("ADEA"); (2) retaliation in violation of the ADEA; (3) Family Medical Leave Act ("FMLA"); and (4) defamation./1 Prior to the summary judgment ruling, the district court dismissed Horwitz's 42 U.S.C. sec. 1983 claim. Horwitz now appeals asking us to reconsider the district court's summary judgment and motion to dismiss decisions.

II. Discussion

A. ADEA

We review the district court's grant of summary judgment de novo, construing all of the facts and reasonable inferences that can be drawn from those facts in favor of the nonmoving party. See Central States, Southeast & Southwest Areas Pension Fund v. Fulkerson, 238 F.3d 891, 894 (7th Cir. 2001). A grant of summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, admissions, and affidavits leave no genuine issue of material fact, and the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c).

The ADEA prohibits an employer from discriminating against an individual on the basis of his or her age. 29 U.S.C. sec. 623(a). An employee must be at least 40 years of age to pursue an age discrimination claim. 29 U.S.C. sec. 631(a). "To succeed on a discrimination claim under the ADEA, a plaintiff must show that her termination or other adverse employment action would not have occurred 'but for' her employer's motive to discriminate on the basis of her age." Fuka v. Thomson Consumer Elecs., 82 F.3d 1397, 1402 (7th Cir. 1996). Although age discrimination can be proved through either the direct method or the indirect burden-shifting method of proof outlined

in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), Horwitz chose to proceed under the latter method. See Fuka, 82 F.3d at 1402. McDonnell Douglas sets forth a three-step inquiry. The first step entails establishing by a preponderance of the evidence a prima facie case of discrimination. See Adreani v. First Colonial Bankshares Corp., 154 F.3d 389, 394 (7th Cir. 1998). To build a successful prima facie case, Horwitz must show that: (1) she falls within the protected age group-- that is, she is at least 40 years old; (2) she performed her job satisfactorily; (3) despite her satisfactory performance, she suffered a materially adverse employment action; and (4) younger employees situated similarly to the plaintiff were treated more favorably. See id.; see also Fisher v. Wayne Dalton Corp., 139 F.3d 1137, 1141 (7th Cir. 1998). "The Supreme Court has clarified that an ADEA plaintiff who shows that he was replaced by someone substantially younger need not prove that the replacement is outside the protected class." Adreani, 154 F.3d at 394 (internal citations and quotation marks omitted). If Horwitz had made out a prima facie case, a presumption of discrimination would arise, and the burden would shift to the Board/2 to articulate a non-discriminatory reason for its materially adverse employment action. Id. Horwitz would still have the opportunity to prove by the preponderance of the evidence that the legitimate reasons offered by the Board were not its true reasons, but were pretext for discrimination. Id.

There is no dispute about whether Horwitz falls within the protected age group, as the Board hired her when she was 48 years old to teach the fourth grade for the 1993 to 1994 school year. The district court found that Horwitz failed to establish a prima facie case of age discrimination because she had not demonstrated that younger teachers were treated more favorably than she. We concur with the district court's assessment. Horwitz alleges that she was excluded from the election, newspaper, and mentoring projects, even though younger teachers participated in such activities. Further, she asserts that her transfer from teaching fourth grade to teaching fifth grade, over her objection, shows that the school favored younger

teachers. Horwitz claims that Dr. Biancalana's decision in the fall of 1996 to give the chairmanship of the Language Arts Committee to a younger teacher is yet another example of how she was treated in an unfavorable manner because of her age. Horwitz contends that this is especially true since she has a masters degree and was the only certified reading specialist on staff, whereas the individual chosen for the chair position did not have a masters degree. According to Horwitz, there were other incidents of age discrimination as well. For instance, Horwitz claims that in August of 1996, Dr. Biancalana hired a new part-time kindergarten teacher who was over 40 years of age, and told her that this was something that she did not usually do. Also during the same period, Horwitz alleges that Dr. Biancalana told one of the younger teachers that she hoped that the teacher did not mind working with an older person. Horwitz asserts that two other older teachers, Peter Lanners, who was born on November 12, 1948, and Barbara Entin, who was born on October 14, 1951, believed that Dr. Biancalana discriminated against them based on their age. Finally, Horwitz reiterates that when she met with Dr. Sloan in mid-November of 1996 to express her distress with the age discrimination occurring against older teachers at the school, he warned her that he would make life miserable for any teacher who escalated any issue. All of these incidents taken together, Horwitz advances, show that younger teachers were treated more favorably than older teachers at Avoca West Elementary School.

There is no concrete evidence in the record substantiating Horwitz's allegations that younger teachers were treated more favorably than older teachers. By way of example, the school has provided data showing that between the 1992 to 2000 school years, over 55% of the teaching staff within the Avoca School District were over the age of 40. Dr. Biancalana who began serving as principal of Avoca West in August of 1993, has hired six teachers as well as a school nurse and Library Technology Coordinator over the age of 40. In fact, Dr. Biancalana since arriving at Avoca West, has selected twelve mentors, of whom seven were 40 years of age and older. Her reviews of the eleven teachers

over 40 years of age at Avoca West are fairly comparable to her predecessor, in that she gave nine of the teachers the same rating, one a lower evaluation, and one a higher evaluation. Both Lanners and Entin did not express affirmatively that they were experiencing age discrimination. More specifically, when Lanners was asked during his deposition, "Did you feel that you were being picked on because of your age?," he responded, "I have no idea. I really don't," andlater said, "Maybe I was rubbing somebody the wrong way." Entin submitted an affidavit in which she said, "As to the allegations of Count I dealing with age discrimination, again, I have no personal knowledge of such allegations and personally believe that I have not been subjected to any age-based conduct or discrimination as a consequence of the activities of the Defendants." From an objective viewpoint, there is evidence showing that Avoca West hired teachers who were 40 years of age and older, had a staff of teachers that was made up of more than 55% within the protected age category, and afforded such teachers mentoring opportunities. One could even argue that Horwitz's own case, as she was hired at the age of 48 and tenured at age 50, is an example of the school district's willingness to hire older teachers and tenure them. Consequently, the district court's decision to grant summary judgment in favor of the Board on Horwitz's ADEA claim was proper./3

B.  Retaliation based on the ADEA

   The district court granted summary judgment in favor of the Board concerning Horwitz's retaliation claim under the ADEA. Keeping in mind the standard we have outlined regarding our review of a district court's summary judgment decision, we address whether Horwitz has presented a retaliation case that merits a jury trial. The ADEA provides that it is "unlawful for an employer to discriminate against any of his employees . . . because such individual . . . has opposed any practice made unlawful by this section, or because such individual . . . has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter." 29 U.S.C. sec. 623(d). Horwitz has pursued her retaliation case based on the ADEA under

the McDonnell Douglas burden-shifting framework, as is permitted. See Sauzek v. Exxon Coal USA, Inc., 202 F.3d 913, 918 (7th Cir. 2000). In order to establish a prima facie case of retaliatory discharge in violation of the ADEA, Horwitz must show: (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse action. See id.; Vanasco v. National-Louis Univ., 137 F.3d 962, 968 (7th Cir. 1998). Before proceeding to the last two steps of the McDonnell Douglas analysis, we explore whether Horwitz has made out a prima facie case of retaliation. Although Horwitz's underlying discrimination claim based on the ADEA has failed, she still may pursue a claim that she was retaliated against for complaining about age discrimination. See Place v. Abbott Labs., 215 F.3d 803, 806 (7th Cir. 2000).

There is no question as to whether Horwitz engaged in an activity protected under the ADEA. She filed her first charge of age discrimination with the EEOC on June 16, 1997 and then a second charge with the EEOC on June 23, 1998 alleging that she had experienced retaliation for filing her initial EEOC charge. In response to both of these charges, the EEOC sent Horwitz a notice of right to sue, dated September 2, 1998. Horwitz pursued her right to sue by filing a complaint against the Board and various other administrators in the Northern District of Illinois on October 16, 1998. Clearly, Horwitz engaged in protected activity under the ADEA when she filed the two EEOC complaints and the instant lawsuit. See McClendon v. Indiana Sugars, Inc., 108 F.3d 789, 796 (7th Cir. 1997). Likewise, it is apparent Horwitz suffered an adverse employment action when she was terminated on April 23, 1999 by the Board. See id.; Gleason v. Mesirow Fin., Inc., 118 F.3d 1134, 1146 (7th Cir. 1997). The district court, however, said that the "Plaintiff fails to present evidence such that a reasonable jury could find that a causal connection exists between her protected activity and her dismissal." To establish the last element in a retaliation case,--that is, the causal connection requirement-- Horwitz needed to prove that the Board's decision to terminate her and the EEOC charges and current lawsuit were not

wholly unrelated. Vanasco, 137 F.3d at 969. As an initial matter, it is difficult to infer causation based solely upon the timing of her termination and the filing of this lawsuit. That is to say, we have said that for there to exist a telling temporal sequence, the employer's adverse action should follow "fairly soon after the employee's protected expression." Davidson v. Midelfort Clinic, Ltd., 133 F.3d 499, 511 (7th Cir. 1998). More than six months elapsed between the time Horwitz filed this lawsuit (October 16, 1998) and the Board terminating her (April 23, 1999). Such a gap in time between her lawsuit and her termination cannot establish a causal connection. See Paluck v. Gooding Rubber Co., 221 F.3d 1003, 1010 (7th Cir. 2000) (collecting cases); Davidson, 133 F.3d at 511 (collecting cases).

Nonetheless, Horwitz is not precluded from coming forward with other evidence supporting the casual connection element. Id. Horwitz attempts to argue that there is a causal connection between her protected activity and termination by reciting many of the facts that we have already discussed in the background and ADEA sections of this case. For instance, Horwitz argues that she met with Dr. Sloan in mid-November of 1996 to address her concerns about age discrimination at Avoca West and he responded by remarking that he would make a staff member's life miserable if he or she escalates an issue. She claims that shortly thereafter she was moved from teaching fourth grade to teaching fifth grade over her objection. In June of 1997, she filed her first EEOC charge and three months later she was criticized for being allegedly uncooperative and told to list cooperation as a goal for the next school year. Her essay was posted on the internet in the fall of 1997, and after this, she requested that the Board investigate her claims of age discrimination. The Board refused to investigate her concerns and instead issued its first notice of remedial warning. Horwitz advances that she took a medical leave in April of 1998 and that she was improperly asked to see the Board physician, an internist, before she could return to work and later the Board said she had to see a psychiatrist. In June of 1998, she filed her second EEOC charge and then the Board issued another notice

of remedial warning concerning her behavior in July of 1998. The Board when it terminated Horwitz relied, she alleges, specifically on 105 ILCS 5/10-22.4, which states that any teacher who does not complete a one-year remediation plan with a satisfactory or better rating can be dismissed. Horwitz claims that the Board must have concluded that her deficiencies were correctable, and thus since a one-year remediation plan was mandatory, she urges that we consider the causation issue in light of this time frame. Finally, Horwitz asserts that she should not be prejudiced by the fact that the Board was told to methodically prepare a file against her, which does take time. Horwitz attempts to show that the timing between the various protected activities (the two EEOC charges and the filing of this lawsuit) that she engaged in and events that occurred immediately thereafter, which she apparently perceives as adverse employment actions, reveals the existence of a causal connection. Horwitz is unable to label certain events as adverse employment actions and tie them to her protected activities in light of the fact that we have found that her termination is the only adverse employment action that she has suffered. Therefore, all of the evidence that Horwitz has provided with relation to the causal connection issue is merely speculative. Thus, Horwitz cannot establish the causal connection element of her prima facie case.

In any event, even if Horwitz were able to present evidence sufficient to establish a prima facie case of retaliatory discharge, she has not successfully shown that the Board's proffered reasons for terminating her were pretextual. The district court found that the Board had produced evidence of non-discriminatory reasons for Horwitz's termination and that the Board had pointed to "several occasions of insubordination, complaints from parents, occasions of unprofessional behavior on the part [of the] Plaintiff towards her fellow faculty members, administrators and outside support staff. Defendants further produce evidence that [the] Plaintiff failed to adequately prepare lesson plans for use during her extended absences and that Plaintiff was not available for consultation during those absences." The Notice of Charges and Bill

of Particulars detail Horwitz's shortcomings as a teacher--both cite thirty-one reasons for her termination.

Horwitz asserts that the reasons given for her termination in the Notice of Charges and Bill of Particulars differ from the reasons Dr. Sloan gave for her termination at Horwitz's unemployment compensation hearing. Horwitz notes that the hearing officer asked Dr. Sloan, "In the final analysis, was she discharged because of this extended absence or because during this absence . . . she failed to comply with policy regarding lesson plans? Or was it a combination thereof?," to which Dr. Sloan replied, "A combination thereof." Furthermore, according to Horwitz, Dr. Sloan had-hand-delivered to her a letter saying the primary reason for her dismissal was her absence without sufficient medical documentation beginning on March 16, 1999 and her failure to supply lesson plans during this period. Horwitz also alleges in her brief that the "Defendants' written evaluations of Plaintiff's performance through March, 1997 showered her with praise and described her as an 'excellent' employee." Finally, Horwitz claims that during a hearing before the Illinois State Board of Education concerning her dismissal, Dr. Sloan said, "we needed to build a case" against Horwitz, rather than stating that the school desired to document what was occurring at the time between Horwitz and the school. All of this, Horwitz asserts, supports a finding of pretext.

Upon reviewing the record, we cannot conclude that the school district's legitimate, non-discriminatory reasons for terminating Horwitz are pretextual. For example, Dr. Sloan initially requested and was allowed to read a prepared statement at the unemployment compensation hearing, in which he summarized how Horwitz over a three-year-period "exhibited a pattern of gross insubordination and unprofessional conduct." He then noted that she had refused to follow school district procedures and policies after being repeatedly directed to do so in three written notices to remedy issued by the Board. "The culminating event," Dr. Sloan said, "that led to her discharge was . . . generated by the fact that on March 16th, 1999, Mrs. Horwitz began an

extended absence that would last through April 23rd, 1999, when she was terminated." At this point, the hearing officer interrupted Dr. Sloan and the dialogue recited above, wherein the hearing officer posed a question about Horwitz's absence and lesson plans, took place. Dr. Sloan, however, made it clear initially that there was no sole reason for the termination of Horwitz and he never retreated from such a position. Dr. Sloan, in a letter dated April 21, 1999 that he sent to Horwitz, said:

Your repeated refusal to respond to the District's requests for verification of the basis for your extended absence from your full-time teaching duties and your unprofessional conduct in failing to communicate with the District's Principal regarding lesson plans for substitutes has adversely affected the District's students and has disrupted necessary planning for students' educational programs. Based upon this continued insubordinate conduct and your established pattern of unprofessional and insubordinate conduct as evidenced by issuance of Three (3) Board Notices of Remedial Warning, I will submit an administrative recommendation to the Board of Education for your termination as a tenured teacher.

There is no doubt that Dr. Sloan quite clearly communicated to Horwitz that her previous three notices of remedial warning along with her recent absence and failure to provide lesson plans for that period caused him to recommend her termination to the Board. As for the comment that Dr. Sloan made during the hearing before the Illinois State Board of Education regarding establishing a case against Horwitz, it is necessary that we place Dr. Sloan's comment within the proper context. The hearing officer had inquired why it took Dr. Sloan so long to recommend to the Board that Horwitz be terminated. Dr. Sloan responded that the school tried to help Horwitz and ensure that she would succeed, but there came a point where it became apparent she was not going to be successful, therefore Dr. Sloan remarked, "[A]t that juncture, as the law requires, we needed to build a case and document the harm that she was doing to the school district, and I believe that we did that, and unfortunately it was a process, and

the law calls for a process that when you're firing a person for incompetence and unprofessional behavior, you have to have a wealth of proof and substantiated documentation to prove that that's what is occurring." Dr. Sloan was simply attempting to account for why it took the school as long as it did to terminate Horwitz. We cannot read into Dr. Sloan's comment any motive on the school's part to fabricate, or put another way, build a false case against Horwitz. He merely was explaining the practical realities involved in removing an employee from the workplace. While it may be true that Dr. Biancalana rated Horwitz as an "excellent" teacher for the 1993 to 1994, 1994 to 1995, and 1996 to 1997 school years, she also stated in her 1996 to 1997 report that she "would like to see more emphasis on these areas at the fourth grade level." The areas Dr. Biancalana was referring to included maintaining positive professional interactions with others and establishing relationships with colleagues which reflect mutual respect. Dr. Biancalana had expressed some unease with Horwitz's professional relationships in her 1997 school year evaluation of Horwitz. Prior to this time, as discussed above, Horwitz had acted in a grossly insubordinate manner when in June of 1995 she abruptly left a meeting with Dr. Biancalana. As we have already recounted, the Board issued its first notice of remedial warning on April 20, 1998, and two more notices followed thereafter. Horwitz was experiencing difficulties in her interactions with faculty and other individuals at the school. Her positive teacher evaluations in no way detract from such problems. It is quite apparent that Horwitz has not proven that the reasons the Board has given for terminating her are in any way pretextual. Horwitz's subjective belief that the Board's actions were retaliatory and that the Board's claimed reasons for terminating her are pretextual in nature does not create a genuine issue of material fact. See Johnson v. University of Wisconsin-Eau Claire, 70 F.3d 469, 479-80 (7th Cir. 1995). Thus, the district court properly entered summary judgment in favor of the Board on Horwitz's retaliatory discharge claim based on the ADEA.

C.  Retaliation Based on the FMLA

The district court granted summary judgment in favor of the defendants with regard to Horwitz's FMLA claim. While the FMLA provides certain substantive guarantees, "the FMLA also affords employees protection in the event they are discriminated against for exercising their rights under the Act." King v. Preferred Technical Group, 166 F.3d 887, 891 (7th Cir. 1999). In a case where an employee is alleging discrimination based on the FMLA, "[t]he issue becomes whether the employer's actions were motivated by an impermissible retaliatory or discriminatory animus." Id. Horwitz asserts that the Board, Dr. Sloan, Dr. Biancalana, and Ballantyne violated the FMLA when they terminated her employment because she took leave to which she was entitled to under the FMLA. Because Horwitz alleges retaliatory discharge under the FMLA, she must establish that the parties involved engaged in intentional discrimination. Id. at 892. Since Horwitz has not provided us with any direct evidence of discrimination, we will apply the McDonnell Douglas burden-shifting framework to her claim that the Board, Dr. Sloan, Dr. Biancalana, and Ballantyne discriminated against her because she exercised her rights guaranteed by the FMLA. Id. To prove a prima facie case of retaliatory discharge under the FMLA, Horwitz must show that: (1) she engaged in a protected activity; (2) the Board, Dr. Sloan, Dr. Biancalana, and Ballantyne took an adverse employment action against her; and (3) there is a causal connection between her protected activity and the defendants' adverse employment action. Id.

The district court found that Horwitz had not provided the school with the requisite notice to trigger a FMLA claim. According to the district court, "the undisputed record reflects that [the] Plaintiff did not provide information such that her employers would reasonably have been on notice as to the severity of her condition, until after [Dr.] Sloan had recommended her dismissal, and nearly a month after her initial absence." Indeed, Horwitz was absent from school beginning on March 16, 1999, and after repeated requests from Dr. Sloan to provide him with medical certification regarding her absence, her doctor sent an apparently inadequate certification on

April 14th. Dr. Sloan then asked for more detailed information from Horwitz's doctor. Horwitz's doctor did send a more specific letter, dated April 22nd, to the school concerning Horwitz's condition. However, Dr. Sloan in a letter dated April 21st (a day before the doctor's note was written) had already told Horwitz that he was recommending to the Board that she be terminated. We have stated that an "employee can be completely ignorant of the benefits conferred by the Act: it is sufficient notice if the employee provides the employer with enough information to put the employer on notice that FMLA-qualifying leave is needed." Stoops v. One Call Communications, Inc., 141 F.3d 309, 312 (7th Cir. 1998). There is serious doubt as to whether Horwitz provided the school with "enough information" to put it on notice that she needed a FMLA-qualifying leave. Nonetheless, we do not need to resolve this question because as we have previously discussed, the school has provided a legitimate, non-discriminatory reason for terminating Horwitz, which has not been determined to be pretextual. Therefore, we affirm the district court's decision to enter summary judgment in favor of the Board, Dr. Sloan, Dr. Biancalana, and Ballantyne.

D.  Defamation Claim

   Initially, we begin by noting that the district court appropriately decided to resolve Horwitz's state law defamation claim (based on Illinois law), even though the trial court had settled the federal issues in her case. The district court had jurisdiction to decide the state claim under 28 U.S.C. sec. 1367(a) because neither side has contended that the defamation claim does not form part of the same Article III case or controversy as the other federal claims (ADEA; retaliation based on the ADEA; FMLA) over which the district court did have original jurisdiction. See Timm v. Mead Corp., 32 F.3d 273, 276 (7th Cir. 1994). The issue becomes whether the district court should have decided not to exercise its jurisdiction over the defamation claim based upon sec. 1367(c), which allows a district court not to assume supplemental jurisdiction over a claim when it has dismissed all claims over which it had original jurisdiction.

Judges are permitted the discretion to determine whether a state law claim should not be dismissed because of other considerations like judicial economy, convenience, fairness, and comity. Id. at 276-77. In this instance, Horwitz's claim was ripe, Illinois law regarding defamation well-settled and straightforward, the litigation was over two-years-old, and discovery had been closed. We see no reason why the district court should have declined its right to assert jurisdiction over Horwitz's state-based defamation claim.

Having said that, we turn to the actual defamation claim itself. The district court, on immunity grounds, found that Horwitz's defamation claim did not survive the defendants' motion for summary judgment. We agree with the district court's assertion that the Board is statutorily immune from Horwitz's claim. Illinois law provides that a "local public entity is not liable for injury caused by any action of its employees that is libelous or slanderous or for the provision of information either orally, in writing, by computer or any other electronic transmission, or in a book or other form of library material." 745 ILCS 10/2-107. As a consequence, the Board may not be sued for the allegedly defamatory remarks it made about Horwitz. See Meyers v. Board of Educ. of the City of Chicago, 121 Ill.App.2d 186, 191, 257 N.E.2d 183, 185 (1970); see also Bobkoski v. Board of Educ. of Cary Cmty. Consol. Sch. Dist. No. 26, No. 90 C 5737, 1991 WL 10742, at *5 (N.D. Ill. Jan. 31, 1991).

We turn to whether the remaining defendants--Dr. Sloan, Dr. Biancalana, and Ballantyne--are also immune from suit. We have remarked with regard to this issue that "even if a statement is defamatory, under Illinois law, the defendants would have immunity for their statements made within the scope of their authority." Klug v. Chicago Sch. Reform Bd. of Trs., 197 F.3d 853, 861 (7th Cir. 1999) (citing Blair v. Walker, 64 Ill.2d 1, 349 N.E.2d 385 (1976)). The question we address is whether Dr. Sloan, Dr. Biancalana, and Ballantyne were acting within the scope of their official duties when they made the alleged statements in question. According to Horwitz, the individual defendants made defamatory

remarks when they were discussing or corresponding with parents about her absence from school that began on March 16, 1999. It is evident that Dr. Sloan, Dr. Biancalana, and Ballantyne were not acting in their personal capacities, but rather their official capacities when they were attempting to respond to parents' concerns regarding Horwitz's absence. Likewise, they were acting within the scope of their official duties and authority when they corresponded or spoke with various parents about Horwitz's absence. We accord such an absolute privilege to particular officials because as the Supreme Court of Illinois in Blair, 64 Ill.2d at 9, 349 N.E.2d at 388, explained, the United States Supreme Court in Barr v. Matteo, 360 U.S. 564, 571 (1959) has said that "[i]t has been thought important that officials of government should be free to exercise their duties unembarrassed by the fear of damage suits in respect of acts done in the course of those duties . . . ." Absolute immunity cannot be "overcome by a showing of improper motivation or knowledge of the statement's falsity, including malice." Klug, 197 F.3d at 861; see also Blair, 64 Ill.2d at 5-6, 349 N.E.2d at 387. The district court thus properly granted summary judgment in favor of the defendants with regard to Horwitz's defamation claim.

E.  Dismissal of the Section 1983 Claim

The district court dismissed Horwitz's 42 U.S.C. sec. 1983 claim. Horwitz alleged in her complaint that the School Board "acted with reckless indifference to plaintiff's concerns resulting in a deprivation of her civil rights" and that Dr. Sloan, Dr. Biancalana, and Ballantyne were involved in a conspiracy to silence her "advocacy for her students, discredit and ultimately terminate her." The conspiracy resulted in a violation of her rights and duties as an advocate for children pursuant to the Individuals with Disabilities Education Act ("IDEA") and the First Amendment. Essentially, Horwitz has brought a First Amendment retaliation claim under sec. 1983. We review a district court's decision to dismiss a complaint under 12(b)(6) de novo. See Pleva v. Norquist, 195 F.3d 905, 911 (7th Cir. 1999). Such a dismissal is proper only if looking at the pleadings, taking

all the facts alleged by Horwitz to be true and construing all inferences in her favor, she fails to state a claim upon which relief can be granted. Id.

First, we assess whether the district court properly dismissed the sec. 1983 claim against Dr. Sloan, Dr. Biancalana, and Ballantyne. Horwitz has sued these defendants in their official and individual capacities. With respect to the individual capacity issue, it is necessary that we consider whether Horwitz has successfully established a First Amendment retaliation claim. In order for Horwitz to establish a sec. 1983 claim based on the First Amendment, she must demonstrate that: (1) her conduct was constitutionally protected and (2) her conduct was a substantial or motivating factor in the defendants' challenged actions. See Thomsen v. Romeis, 198 F.3d 1022, 1027 (7th Cir. 2000). To determine whether Horwitz's speech was constitutionally protected, we need to ask whether her speech addressed a matter of public concern, and if so, then we must consider whether Horwitz's interest in speaking outweighs the interest of the state in efficiently providing services. See Kokkinis v. Ivkovich, 185 F.3d 840, 843-44 (7th Cir. 1999). To determine whether Horwitz's speech was a matter of public concern, we consider the content, form, context, and motivation of her speech, although content is the most important factor. See Button v. Kibby-Brown, 146 F.3d 526, 529 (7th Cir. 1998). We will assume, without deciding, that the essay Horwitz submitted to Wilmette Life in the fall of 1997 criticizing the school district addresses a matter of public concern and that her interest in speaking outweighs the interest of the state in efficiently providing services. Nonetheless, we cannot conclude that Horwitz's essay in any way was a substantial or motivating factor in the defendants' ultimate decision that Horwitz should be terminated. The essay was submitted to Wilmette Life on October 9, 1997 and Horwitz was terminated on April 23, 1999; approximately eighteen months had passed between the time Horwitz had engaged in speech that was constitutionally protected and her termination. These two events are simply too remote in time to infer that Dr. Sloan, Dr. Biancalana, and Ballantyne believed that Horwitz's

termination was necessary based solely on this essay. As already noted, several other incidents occurred between Horwitz and the school between the fall of 1997 and April of 1999 that played a role in the decision to terminate her. Horwitz has not successfully mounted a First Amendment retaliation claim against Dr. Sloan, Dr. Biancalana, and Ballantyne.

   Although we have decided that Horwitz's sec. 1983 claim against Dr. Sloan, Dr. Biancalana, and Ballantyne in their individual capacities has failed, we still must address whether her claim survives against these defendants in their official capacities. Since Horwitz has brought her suit against these particular individuals in their official capacities, "the trial judge must identify those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue." Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 737 (1989). It is necessary to initially determine which officials have final policymaking authority because "[o]nce those officials who have the power to make official policy on a particular issue have been identified, it is for the jury to determine whether their decisions have caused the deprivation of rights at issue by polices which affirmatively command that it occur or by acquiescence in a longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity." Id. (internal citations and quotation marks omitted). The district court said that it did not "even [have] 'bare allegations' from which to string together an argument that the individual Defendants enjoyed final decision-making authority." Horwitz v. Board of Educ. of Avoca, No. 98 C 6490, 2000 WL 1100858, at *3 (N.D. Ill. June 7, 2000). Deciding whether a specific official has final policymaking authority is a question of state law. See Duda v. Board of Educ. of Franklin Park Pub. Sch. Dist. No. 84, 133 F.3d 1054, 1061 (7th Cir. 1998). We have said that "nothing in the [Illinois] School Code allows us to infer that a superintendent or principal has been delegated policymaking authority with respect to personnel decisions." Id. Furthermore, there is no reason for us to

believe, based on the Illinois School Code, see 105 ILCS 5/10-12, that the president of a school board has final policymaking authority. We agree with the district court that Horwitz has not provided us with any basis to conclude, beyond her own bare allegations, that either Dr. Sloan (superintendent of schools of Avoca District No. 37), Dr. Biancalana (principal of Avoca West School), or Ballantyne (president of the Avoca School Board) is a final policymaker. Horwitz's claim against Dr. Sloan, Dr. Biancalana, and Ballantyne in their official capacities was appropriately dismissed by the district court.

What remains to be considered is Horwitz's sec. 1983 claim against the Board. Horwitz's sec. 1983 claim against the Board, which is an agency of the municipal government, see Smith v. Chicago Sch. Reform Bd. of Trs., 165 F.3d 1142, 1148 (7th Cir. 1999), may not be based on respondeat superior. Id. Monell places the burden on Horwitz to demonstrate that an official policy or custom of the Board's caused her injury. Id. at 1148-49. Horwitz in her complaint states, "On several occasions, including January 1998, the plaintiff or a representative informed the school board of the numerous violations of plaintiff's rights regarding age discrimination and deficient educational practices. The school board maintained a policy of ignoring such violations in reckless disregard of the truthful and well substantiated allegations." Horwitz, in her complaint, further alleges that the Board improperly issued its first and second notice of remedial warning, inappropriately compelled her to undergo a psychological exam, and apparently ordered her not to express her opinion about special education situations to parents on the basis that since she was not certified in special education her opinion was not authoritative, even though Horwitz claims she has an obligation under the IDEA statute to express her opinion on such matters. The rest of her complaint focuses more exclusively on the behavior of particular individuals, like Dr. Sloan, Dr. Biancalana, and Ballantyne. She acknowledges such an emphasis in her complaint, when she states, "In engaging in the acts and conduct aforesaid,

defendants and each of them were acting under color of the Illinois School Code, a statute of the State of Illinois. Such acts and conduct, having been done and taken by, and with the approval and ratification of persons in policy-making positions constitute a policy of defendant Board Of Education." However, we have concluded that Dr. Sloan, Dr. Biancalana, and Ballantyne do not have policymaking authority and furthermore the Board cannot be liable for these defendants' actions based on respondeat superior. Quite simply, Horwitz's complaint does not adequately explain how the Board maintained a policy or custom that was directed at suppressing her right to free speech. Thus, the claim against the Board was properly dismissed.

III.  Conclusion

   For the reasons stated herein, we AFFIRM the decision of the district court.

FOOTNOTES

/1 Horwitz challenges the district court's decision not to accept her memorandum of law in opposition to the defendants' motion for summary judgment. However, the district court did allow Horwitz to file a Local General Rule 12(N) statement of facts. Since we review a grant of summary judgment de novo, a party cannot be prejudiced by a district court's decision not to consider her summary judgment memorandum as long as the court has addressed the motion on its merits. See Scaife v. Racine County, 238 F.3d 906, 907 (7th Cir. 2001); Price v. City of Chicago, 251 F.3d 656, 658 n.2 (7th Cir. 2001). The district court did contemplate the merits of Horwitz's case before granting summary judgment in favor of the defendants; consequently, Horwitz has not been prejudiced by the court's decision not to consider her summary judgment motion. Horwitz in her brief has raised numerous other claims, not dis cussed above, that she asserts are worthy of consideration. Nonetheless, after careful review of the record, we have determined that these claims are without merit.

/2 Horwitz has brought her ADEA and retaliation claim based on the ADEA against only the Board. She has properly done so, as we have suggested that there is no individual liability under the ADEA. See Matthews v. Rollins Hudig Hall Co., 72 F.3d 50, 52 n.2 (7th Cir. 1995); Thelen v. Marc's Big Boy Corp., 64 F.3d 264, 267 n.2 (7th Cir. 1995). Horwitz has brought the rest of her claims--FMLA, defamation, and sec. 1983--against

all of the named defendants (the Board, Dr. Sloan, Dr. Biancalana, and Ballantyne).

/3 As will be seen in our discussion below concerning Horwitz's retaliation claim based on the ADEA in section B, the Board has provided a legitimate, non-discriminatory reason for terminating her that did not involve pretext. Therefore, even if we presumed that Horwitz did make out a successful prima facie case of age discrimination, her ADEA claim would still fail because we have found that the Board legitimately terminated her.