# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

Nos. 01-3577, 01-3791 & 01-4197

STEVEN J. ALBRECHTSEN,

*Plaintiff-Appellee, Cross-Appellant,*

*v.*

BOARD OF REGENTS OF THE
UNIVERSITY OF WISCONSIN SYSTEM,

*Defendant-Appellant, Cross-Appellee,*

and

H. GAYLON GREENHILL, *et al.*,

*Defendants-Appellees.*

———————

Appeals from the United States District Court
for the Western District of Wisconsin.
No. 00-C-597-S—**John C. Shabaz**, *Judge.*

———————

ARGUED SEPTEMBER 6, 2002—DECIDED OCTOBER 23, 2002

———————

Before POSNER, EASTERBROOK, and DIANE P. WOOD,
*Circuit Judges.*

EASTERBROOK, *Circuit Judge.* During the spring of 1998
Steven Albrechtsen, a professor in the Department of

Health, Physical Education, Recreation, and Coaching at the University of Wisconsin-Whitewater, suffered two reverses: he was told that he could not teach two particular summer workshops that year (losing about $1,210 in pay), and he did not receive an $86 merit increase in his salary for the next year. He responded with this lawsuit under Title VII of the Civil Rights Act of 1964. Albrechtsen contended that the Department had discriminated against him on account of sex and retaliated for his support of other teachers who he believed to have been the victims of sex discrimination. He had some other claims as well, but the district judge removed them before the start of trial. A jury decided that Albrechtsen was the victim of retaliation but not sex discrimination, and it awarded him a total of $293,840 in damages (when topped up with four years' back pay calculated by the court). The bulk of this ($250,000) represented mental distress. Sensing that this number had been drawn from a hat, the district judge produced a smaller container and drew out $100,000 to replace it; Albrechtsen accepted the remittitur and a final award of $143,840, to which the judge added about $118,000 in attorneys' fees.

Both sides have appealed. Albrechtsen's requires no discussion beyond stating that we agree with the district judge's decision with respect to all of the claims resolved before trial. The University's appeal presents nine contentions, counting the major subdivisions, but we need consider only one: whether the evidence supports the jury's conclusion that the University retaliated against Albrechtsen for taking a stand against sex discrimination.

After a trial, the evidence (including all plausible inferences) normally must be viewed in the light most favorable to the verdict. That's a blackletter principle, but what is normal does not always hold. The norm supposes that the parties have presented that evidence to the court of appeals in a digestible fashion, so that we may

evaluate the record's contents. Both sides fell down at that task. The University failed to comply with Circuit Rule 28(c): "The statement of facts required by Fed. R. App. P. 28(a)(7) shall be a fair summary without argument or comment. No fact shall be stated in this part of the brief unless it is supported by a reference to the page or pages of the record or the appendix where that fact appears." Instead of summarizing the record so that we could learn what inferences in Albrechtsen's favor the evidence fairly supports, the University's "statement of facts" is a tendentious recap of the defense case. No opportunity to disparage Albrechtsen's position is missed, and facts that might support his position do not see the light of day. When his turn came, however, Albrechtsen did—nothing. Instead of marshaling the facts that support the verdict, the half-page portion of the brief captioned "Statement of Facts" just refers us to the district court's opinion denying the University's motion for summary judgment. This is bad on three counts: first, appellate briefs may not incorporate other documents by reference, see *Fleming v. Kane County*, 855 F.2d 496, 498 (7th Cir. 1988); *Hunter v. Allis-Chalmers Corp.*, 797 F.2d 1417, 1430 (7th Cir. 1986); second, we need to know what evidence was presented *at* trial, not whether the district judge thought that there was an issue *for* trial; third, the district court's overview of the pretrial situation does not contain a single reference to the record. Albrechtsen has effectively provided no statement of facts at all.

An appellee is entitled to pretermit a statement of facts "unless . . . dissatisfied with the appellant's statement". Fed. R. Civ. P. 28(b). When the appellee chooses to omit a statement of facts, the court of appeals may decide the case on the basis of the facts that the appellant supplied. See *Investment Funds Corp. v. Bomar*, 306 F.2d 32 (5th Cir. 1962). Just as many district courts require paragraph-by-paragraph responses to facts recited in sup-

port of motions for summary judgment, appellate courts require narrative responses. The effect of omission is the same in either event—the court treats silence as assent to the moving party's presentation. See, e.g., *Bradley v. Work*, 154 F.3d 704, 707-08 (7th Cir. 1998); *Little v. Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir. 1995).

This is not to say that we have a fetish for section headings. If a statement of facts appeared somewhere else in the brief, say as an introduction to a section with the caption "Argument," we would give it the same effect as one with the proper caption and in the proper place. See Fed. R. App. P. 28(a). Yet Albrechtsen's brief falls down here too. His entire argument devoted to the sufficiency of the evidence fits within 8 pages, only a quarter of the space the University dedicated to laying out its version of the facts, and it does not furnish any detail. Most of the references in this section are to the administrative charge of discrimination, which lacks evidentiary value. When asked at oral argument what evidence he was relying on, counsel replied: "The entire record." That will not do, nor will counsel's fallback invitation that we read all of Albrechtsen's testimony. Courts are entitled to assistance from counsel, and an invitation to search without guidance is no more useful than a litigant's request to a district court at the summary judgment stage to paw through the assembled discovery material. "Judges are not like pigs, hunting for truffles buried in" the record. *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991). We therefore approach this appeal on the assumption that the facts are those that the University has recounted, plus those in the transcript pages to which Albrechtsen's brief directly refers.

From that perspective, this is an easy case. To show that the University violated Title VII, Albrechtsen had to establish that (a) he complained about sex discrimination; (b) the persons who made the decisions in 1998 knew

about those complaints; and (c) the adverse actions in 1998 occurred because of the complaints (in other words, that, if Albrechtsen had not complained, and all else had remained the same, he would have received a raise and been allowed to teach the workshops). As the University recounts the story, the only complaint in the record is a letter that Albrechtsen wrote in 1997, and this letter—though full of protests about the management of the Department—does not contain the words "sex" or "gender." Instead the letter contends that the Department is mistreating *all* members of the faculty (and picking on Albrechtsen in particular), a position that is incompatible with a contention that men have been preferred over women, or the reverse. We read that letter the same way the University does, and no reasonable juror could understand it otherwise. If there has been no protest about sex discrimination, there cannot have been any prohibited retaliation.

The University adds that it had lawful reasons for acting as it did. A new department chair asked faculty members to submit student evaluations for use in the merit-pay process. Albrechtsen refused to do this, and the chair responded by withholding any merit pay increase. The new chair asked Albrechtsen for a current curriculum vitae so that she could assess whether his knowledge encompassed the subjects he proposed to teach ("Wilderness Medicine" and "Electrocardiography"); again Albrechtsen refused, and again the chair followed Albrechtsen's "no" with a "no" of her own. Albrechtsen *concedes* that he refused to furnish a current C.V. or hand over student evaluations; he says that he viewed the requests as harassing and that the Department should have known his qualifications to teach the workshops and receive a merit increase. Maybe—though new administrators may want to verify for themselves what their predecessors supposedly knew. Often people come to management posts plan-

ning to change the way things are done, so the fact that Albrechtsen had taught these workshops, and received merit increases, in years past does not imply that the new chair must have been discriminating or retaliating when she asked for information and concluded that a truculent faculty member should not receive a reward. With only the January 1997 letter to go on it would be impossible for a jury reasonably to conclude that the decisions in spring 1998 were retaliation rather than a use of the broom that new managers often bring to office.

Albrechtsen tells us that the protected speech occurred between 1987 and 1991, when he made numerous protests about sex discrimination. By his lights, what the 1997 letter does is imply that the Department would not have forgotten these events. Yet Albrechtsen does not point to any example of his pre-1997 protests in the record. The few references in his brief to the trial record yield only allusions to what may have happened. Because the record does not establish the contents of these communications—at least, Albrechtsen's references did not enable us to find them—it is hard to see how the evidence could be sufficient. And the possibility that Albrechtsen uttered more recent complaints is not an assertion that Albrechtsen made on the stand. The "long litany of stuff" that the University's chancellor mentioned (without detail) during his testimony lacks any date or content; Albrechtsen did not attempt at trial or on appeal to explain what this "stuff" might be. Nor could we find any case in which a claim has been held sufficient despite lack of *any* detail about who said what to whom and when. Albrechtsen has not substantiated any claim that the University retaliated against oral statements made roughly contemporaneously with the 1997 letter. That leaves the earlier protests.

It would be bizarre for an academic department to wait most of a decade, promoting the faculty member

repeatedly (Albrechtsen received tenure in 1989, was promoted to associate professor in 1991 and to full professor in 1995), and allowing him to teach the summer workshops of his choice, only to "retaliate" by withholding a raise and canceling two workshops in 1998. If the Department had it in for him all the while, why the promotions and the substantial raises that went with them? We do not know of any case in which a court has found (or permitted a jury to find) that action so long deferred after the provocation, despite the possibility of immediate retaliation (an important qualification, see *McGuire v. Springfield*, 280 F.3d 794, 796 (7th Cir. 2002)), could be deemed a consequence of that provocation. To the contrary, we regularly sustain summary judgments based on the view that a year's gap between the act and the supposed consequence shows that a causal relation is too unlikely to support a decision by the preponderance of the evidence. See, e.g., *Lalvani v. Cook County*, 269 F.3d 785, 790-91 (7th Cir. 2001); *Horwitz v. Board of Education*, 260 F.3d 602, 612-16 (7th Cir. 2001). Here the gap was at least seven years. A contention that the events of 1987 to 1991 caused the decisions of 1998 is too farfetched to be the basis of a money judgment.

REVERSED

DIANE P. WOOD, *Circuit Judge*, concurring in part and dissenting in part. A jury heard all the evidence about Steven Albrechtsen's claim of retaliation and sex discrimination in violation of Title VII at the hands of the University of Wisconsin–Whitewater (UWW), and it decided that Albrechtsen had proven his retaliation case. Largely because Albrechtsen's lawyer filed a poor brief in this court, the majority has decided to overturn the jury's verdict and order judgment for the University. While I agree that the briefs filed by both parties in this appeal were seriously flawed—the University's brief is tendentious, ignores the proper standard of review for jury verdicts, misleadingly disregards facts that were unfavorable to its position, and is thus generally unreliable, while Albrechtsen's brief is so condensed as to be almost (but not quite entirely, as I explain below) devoid of useful information in support of the judgment—we have a responsibility to assess what is before us fairly and to respect both the perspective of the trial judge and the role of the jury in civil litigation. When one does this, it is apparent that there was sufficient evidence before the jury to support its verdict in favor of Albrechtsen. I therefore respectfully dissent.

As the majority notes, *ante* at 4, in order to show that the University violated the anti-retaliation provisions of Title VII, Albrechtsen had to establish that

> (a) he complained about sex discrimination; (b) the persons who made the decisions in 1998 knew about those complaints; and (c) the adverse actions in 1998 occurred because of the complaints.

The majority's first misstep is to accept the University's position that the *only* instance of a complaint on which Albrechtsen was relying was to be found in a letter that he wrote on January 10, 1997, to H. Gaylon Greenhill, then the Chancellor of UWW. The University made the same

argument before the district court, and the district court rejected this position in its Memorandum and Order denying (apart from the remittitur to which the majority refers) the University's post-verdict motions under Fed. R. Civ. P. 50(b) and 59. As the district court's order (to which Albrechtsen refers specifically in his brief) makes clear, the January 10 letter was not the only evidence of a complaint before the jury:

> Defendant [*i.e.*, the University] contends that the Court erred in allowing plaintiff to attribute retaliation to the January 10, 1997 letter rather than the events before 1991 expressly articulated in his EEOC charge. This letter was properly admitted to show defendant's knowledge that plaintiff had opposed gender discrimination.

> Defendant contends that this letter does not oppose gender discrimination. The Court disagrees. The letter written by plaintiff to H. Gaylon Greenhill, the Chancellor of UWW, states, "These members of the tenured faculty have repeatedly violated the rights of individuals, acted without regard for law and procedure and perpetuated an extremely hostile work environment in Williams Center." This statement in conjunction with plaintiff's past complaints provided notice to defendant that plaintiff opposed gender discrimination.

Brief for Appellant, App. 17.

At oral argument, counsel for the University conceded that protection for Title VII purposes did not extend only to written documents. Oral complaints of discrimination count too, and evidence of such oral complaints was an important part of Albrechtsen's case. The district court properly recognized this, when it referred to "plaintiff's past complaints" to give context to the January 10 letter.

Moreover, there was evidence in the record in support of Albrechtsen's position—to which he referred in his brief—

of both the oral complaints and the fact that they were sufficient to make the responsible defendants aware of his position. For example, the brief cites to Chancellor Greenhill's testimony on cross-examination, Transcript at 2-180, in support of the verdict. If one turns to that page and the one that immediately follows it in the transcript, one finds the following exchange:

Q   [Mr. Lasker, Albrechtsen's lawyer]: You testified on direct examination, Dr. Greenhill, that sex discrimination was a recent issue. What did you mean by that?

A   [Greenhill]: It was recent in the sense of it being raised by Dr. Albrechtsen. I mean the question of sex discrimination in America is, is, been around. But—

Q:  So what do you mean by your asserting that Dr. Albrechtsen's allegation of sex discrimination was recently made?

A:  That it isn't that—it was late in this long litany of stuff, that, of complaints and such that I recall any kind of reference to sex discrimination. It may have been raised by other—to other people, but I, not to me.

Two pages later, at Tr. 2-183, which is also cited in Albrechtsen's brief, Chancellor Greenhill acknowledged that he received the January 10 letter.

This exchange is important in a number of ways. First, it shows that Albrechtsen indeed did complain expressly about sex discrimination. Second, it shows that the official with final authority over UWW knew about those complaints. Third, it shows that the complaints were recent. Contrary to the majority's assumption and the University's representation, the complaints occurred very close in time to the retaliatory actions about which Albrechtsen was complaining. These points correspond exactly to the three elements the majority acknowledges Albrechtsen had to prove. There was nothing irrational about the jury's

decision to credit this testimony, to use it to illuminate ambiguous references in the January 10 letter, and to base its ruling for Albrechtsen on this evidence. The majority insists on looking at the letter in isolation, which is the only way that it can conclude that no reasonable juror could have understood it to be referring to sex discrimination (in any of its forms—direct, or harassment). That is not the way the evidence was presented to the jury, and the jurors were not required to put on blinders to the rest of the evidence when they considered the letter.

The fact that Dean Barnett testified (in another reference furnished to us by Albrechtsen's lawyer) that he did not remember Albrechtsen's complaints is not dispositive. The exchange set forth below is equivocal, and the jury might have concluded that the Dean was not being fully forthcoming:

> Q: Were you [*i.e.*, Barnett] even aware that Steve Albrechtsen had in 1997 complained of sexual harassment?
>
> A: I do not remember those kinds of complaints. It is possible that in one of those complaints it was explicitly mentioned. I do know that he complained about individuals. I do know that he complained about being discriminated against. I do know that he complained that other members in the department were disadvantaged because of their association with him. I do not remember in particular that gender was an issue.

Tr. 2-57-58. Juries are sometimes skeptical about sudden failures of memory on the part of people who otherwise have a detailed recollection of the past.

The jury was also entitled to conclude that the University's supposed legitimate reasons for taking the actions it did were pretextual. True, a jury certainly could have found that the new department chair (Clayton) wanted

fresh resumes from everyone on the faculty, but it equally might have found this to be pointless if Albrechtsen's *vita* had not changed since the last one on file. The jury might have found the University's newfound concern about his qualifications to teach the summer classes to be phony, since he had taught the very same classes for the past three years, and since some of the very same people (Barnett and Greenhill) had approved the earlier offerings. Moreover, while the majority makes much of the fact that Clayton's sudden concern with Albrechtsen's qualifications could have been the "use of the broom" that new managers frequently bring to office, it might also have noted that Clayton became department chair in the fall of 1996, more than a year and a half before her March 1998 memorandum raising concerns about Albrechtsen's ability to teach the workshops. And while she testified on the stand that she was on a trip out of the country at the time of the 1996 approval of the workshops and that a deputy signed off on the workshops in her stead, a responsible department chair who was new to her post—and intent on using her new manager's broom—would almost certainly have reviewed all such documents upon her return. A reasonable jury might have concluded that Clayton had every opportunity to object to Albrechtsen's qualifications at the beginning of her tenure as department chair in 1996, but did not do so until the following academic year, in the spring of 1998, after a new round of complaints from Albrechtsen.

Furthermore, the courses—"Wilderness Medicine" and "Electrocardiography"—were within the scope of Albrechtsen's professional training. As the University concedes in its Reply Brief at 19, Albrechtsen "completed a doctoral degree in physiology and biophysics at Colorado State University, has expertise in cardiovascular physiology and environmental physiology, has teaching experience at UWW, Colorado State University and the University of

Colorado, and is a member of the American College of Sports Medicine, the American Association of Cardiovascular and Pulmonary Rehabilitation, the Wilderness Medical Society and other professional organizations." The jury also knew that the University's story about the reason for disapproving the 1998 offerings had shifted; at one point, it said that it received notice of his interest in teaching the classes too late to include them in the catalog, but later, it asserted that the lack of a resume and its concerns about his background were the real reason he could not present them. The jury reasonably could have found that these were just excuses, and that the University was instead retaliating for his complaints.

The majority also questions why the University would have decided to retaliate against Albrechtsen for his constant complaints when it had promoted him several times. *Ante* at 6. The answer is simple: it granted him tenure and later promoted him under threat of legal action based on his earlier complaints. Paragraph 404 of Albrechtsen's complaint sets forth the terms of a settlement agreement that Greenhill and he signed on June 9, 1993, that was designed to govern his promotion process. The 1993 agreement stated in part: "The parties affirm that any evaluation of Dr. Albrechtsen for promotion to rank of full professor shall be conducted under established criteria (involving teaching, research, and service) and procedures at the department, college, and university levels." The agreement was concluded right in the middle of the promotion process the majority outlines: tenure in 1989, promotion to associate professor in 1991, promotion to full professor in 1995. There is also ample evidence of continued complaints about discrimination over that entire course of time. Thus, the hostility that erupted in 1998 was not new; it merely took on a more virulent form, which amounted to an adverse employment action in retaliation for the recent complaints of sex discrimination described by Chancellor Greenhill.

Because I would affirm the jury's verdict, as properly modified by the district court, I would also affirm the court's award of attorney's fees. I agree with the majority that there is no merit to Albrechtsen's cross-appeal, and so to that extent I concur in its opinion. I cannot, however, support this court's decision to second-guess the verdict of a jury that heard all the testimony pertaining to Albrechtsen's claim and concluded that he was the victim of unlawful retaliation. I therefore dissent.

A true Copy:

      Teste:

                 _____
                 *Clerk of the United States Court of*
                     *Appeals for the Seventh Circuit*