**Gerald BROADWATER, Plaintiff,**

v.

**HEIDTMAN STEEL PRODUCTS, INC., and Darryl Whitner, Defendants.**

**No. 00–CV–09920MJR.**

United States District Court, S.D. Illinois.

Jan. 9, 2002.

Heidi L. Leopold, James M. Martin, Martin, Malec & Leopold, P.C., St. Louis, MO, for plaintiff.

James N. Foster, Burton D. Garland, Jr., McMahon, Berger, Hanna, Linihan, Cody & McCarthy, St. Louis, MO, for defendants.

## MEMORANDUM and ORDER

REAGAN, District Judge.

### I. *Introduction*

Gerald Broadwater, a white male born on August 4, 1947, worked for Heidtman Steel Products, Inc. from July 1990 until August 2000, when he was discharged. In December 2000, Broadwater filed suit in this District Court against Heidtman Steel and against Darryl Whitner, his supervisor as Heidtman. Following the Court's partial grant of a motion to dismiss, Broadwater filed a First Amended Complaint. By Order filed July 11, 2001, the Court partially granted a motion to dismiss the First Amended Complaint.

On August 1st, Broadwater filed a 15–page Second Amended. Complaint to which voluminous documents were attached, including correspondence between Broadwater and Heidtman, correspondence between Broadwater's attorneys and Heidtman, and documents relating to Broadwater's two employment discrimination charges filed with the United States Equal Employment Opportunity Commission ("EEOC").

Broadwater's Second Amended Complaint ("complaint") alleges age discrimination against Heidtman (Count I), retaliatory discharge and reverse race discrimination by Heidtman (Count II), intentional infliction of emotional distress against Heidtman and Whitner (Count III), and violations of the Illinois Eavesdropping Act by Heidtman and Whitner (Count IV). Count V of Broadwater's complaint, entitled "Punitive Damages," seeks a minimum of $150,000 from each of the two Defendants and alleges that their acts were taken "intentionally and in gross disregard of Plaintiff's rights" (Doc. 31, p. 17).

## II. *Procedural Status*

Now before the Court is Defendants' fully-briefed summary judgment motion, which was filed November 20, 2001. After obtaining additional time in which to oppose the motion, Broadwater filed a motion for leave to file an oversized response on December 12, 2001. Although cognizant of the fact that this case involves multiple issues which required briefing, the Court notes its displeasure with both parties' pleadings on the summary judgment issues.

The Local Rules of this District limit briefs in support of or opposing summary judgment motions to **10 pages**. First, Defendants sought leave to file a brief exceeding the 10–page limit. By Order filed November 19, 2001, the Court granted that motion and allowed Defendants to file a brief 25 pages in length. In the same Order, the Court excused the parties from complying with the "motion packet" procedures of Local Rule 7.1(g) and directed them to simply file memoranda supporting or opposing summary judgment. Thus, Defendant was to file a motion for sum-

mary judgment accompanied *only* by a memorandum supporting summary judgment. Plaintiff was to file *only* a memorandum opposing summary judgment. Neither party followed this directive.

Instead, Defendants filed a 25–page memorandum supporting summary judgment [1] *plus* a 30–page statement of uncontroverted facts supporting their motion (*see* Docs. 48, 49). Plaintiff then filed a 7–page "response" to the motion for summary judgment (Doc. 57), *plus* an 11–page "Statement of Uncontroverted Facts" (Doc. 58), *and* a motion for leave to file a *48–page* memorandum opposing summary judgment. Finally, Defendants moved for (and this Court now **GRANTS**) leave to file a 15–page reply brief on summary judgment (granting Doc. 62). So, Defendants filed 70 pages of argument for summary judgment, and Plaintiff filed 66 pages of argument opposing summary judgment.

Counsel are strongly advised, in the future, to not ask this Court for leave to file any memoranda (supporting or opposing dispositive motions) *longer than 15 pages.* The Court has handled complicated patent cases and employment discrimination cases in which the parties were able to limit their briefs supporting and opposing summary judgment to 10 or 15 pages. The Court does not believe this case is so uniquely complex that it required 136 pages of supporting and opposing briefs (not counting the hundreds of pages of affidavits, deposition excerpts, and exhibits) submitted by each party.

Although displeased with the parties' voluminous submissions, the Court **GRANTS** Plaintiff's motion for leave to exceed Local Rule 7.1(c)'s 10–page limit (Doc. 59). The Clerk of Court is **DIRECTED** to file-

---

**1.** Defendants' memorandum actually contained 26 pages, but the 26th page contained only a certificate of service.

stamp and docket Plaintiff's memorandum opposing summary judgment and Defendants' reply brief in support of summary judgment, as the Court has considered the arguments contained therein. The Court now rules on Defendants' summary judgment motion, beginning with an overview of relevant facts and the governing legal standards.

### III. *Key Facts* [2]

Heidtman Steel Products, Inc. operates a steel processing facility in Granite City, Illinois. Darryl Whitner, a black male, currently serves as Plant Manager for the Granite City facility. He has held that position since 1995.

Gerald Broadwater began work for Heidtman Steel in July 1990, initially working at the company's St. Louis, Missouri facility as a "packer" on the paint line. After the St. Louis plant closed in January 1991, Broadwater requested and received a transfer to the Granite City facility. Broadwater worked on the third shift in Granite City. His Shift Supervisor was Darryl Whitner.

In 1995, Whitner recommended Broadwater for promotion to a supervisor's position. Broadwater was promoted to supervisor on third shift. In this position, Broadwater received a pay increase, and he supervised fifteen employees. Sometime in 1996, Whitner became Plant Manager of the Granite City facility. In February 1997, Heidtman Steel equalized the pay of its supervisors. This equalization involved reducing the pay of Broadwater and at least one other supervisor, Mike Becherer, to bring their salaries into line with the salaries of other Heidtman supervisors.

In October 1999, Heidtman had two or three video cameras at the Granite City facility. The video cameras were used to record pictures of defective steel while keeping the production line running. During the week, the cameras were kept on the plant floor, near the steel processing equipment. Over the weekend, the cameras were stored in a camera bag in a locked compartment in the supervisors' office. The area where the cameras were stored was roughly three feet from Broadwater's desk.

On Friday, October 8, 1999, after his shift, David Hemphill returned a video camera to the supervisors' office. While returning the bag containing the video camera, Hemphill accidentally jostled the camera into "record" mode. While the video camera was running inside the bag, it captured the audio portion of a conversation between Broadwater and another supervisor. On the tape, Broadwater made a disparaging remark about a fellow supervisor, Tracy McElroy. Specifically, Broadwater remarked that McElroy had "sucked big black dick," referring to McElroy's efforts to win favor or ingratiate himself with Plant Manager Whitner.

When a vendor on site at the Granite City facility discovered voices on the videotape, he reported the discovery to Heidtman. Supervisor Mark Hessler then informed Darryl Whitner about the videotape. Whitner listened to the tape for four seconds, instructed Hessler to stop the tape, locked the tape in his own desk drawer, and notified the Director of Human Resources (Sandy Tosha) about the tape. Whitner then forwarded the tape to Tosha.

On November 1, 1999, Tosha traveled to the Granite City plant to investigate the incident regarding the tape. Tosha met with Broadwater, Whitner, and others. After Whitner left the conference room,

---

**2.** These undisputed facts plainly appear in the record, in documentary material, or in deposition testimony submitted with the parties' memoranda.

Tosha played the tape for Broadwater. At the end of the meeting, Tosha advised Broadwater that he was suspended until further notice. At the conclusion of Heidtman's investigation into the incident, Broadwater was reinstated to his position as Third Shift Supervisor with benefits and back-pay, except for a four-day period of suspension.

On July 4, 2000, Heidtman employee John Randall reported to work for the third shift. Randall drove his motorcycle through the Granite City plant, and employees reported that Randall appeared to be under the influence of alcohol. Broadwater, the Third Shift Supervisor, confronted Randall, who admitted that he had been drinking earlier in the day and admitted that he had left tire tracks from his bike in the plant.

The parties' statements of "uncontroverted facts" contain slightly differing versions of what occurred next. According to Heidtman, Broadwater gave Randall the option to (a) submit to a drug and alcohol test or (b) go home, and Randall elected to go home. According to Broadwater, he "told John Randall that he would have to take an alcohol test," Randall responded that "he could not take an alcohol test because he would fail same," and Broadwater never told Randall that if he left the premises "there would be no consequences from his reporting to work in an intoxicated condition" (Doc. 58, pp. 6–7). What is clear is that Randall did not submit to a drug or alcohol test; he went home.

On July 5, 2000, the company commenced an investigation of the previous day's events. Ultimately, Heidtman determined that Broadwater had violated the company's Substance Abuse Policy by offering Randall the option of taking the drug test or going home. Heidtman's Substance Abuse Policy provides that any employee suspected of being under the influence of alcohol or drugs at the work-place *shall* submit to a drug and/or alcohol test at a medical facility, and refusal to submit to such a test will result in discharge (*see* Employee Handbook, Exh. 4 to Doc. 60, pp. 28–29). In Heidtman's assessment, because Broadwater allowed Randall to go home, Heidtman could not discharge Randall for refusing to take the drug test.

As a result of the investigation into the incident, Heidtman suspended Randall for five days and issued a written warning to Broadwater regarding his mishandling of the situation. The warning (Exh. M to Doc. 48) stated:

> The situation with John Randall was not handled appropriately and as a supervisor you used extremely poor judgement [sic] in giving him the *option* of going home or taking an alcohol test. If someone has shown up for work under the influence, they should be told that they are going to be taken to the hospital for an alcohol test, not given an option of taking the test or going home....

> Another area of poor judgement [sic] was once you determined him to be under the influence you allowed him to go home on a motorcycle. This subjected the Company to the possibility of being held liable if he had injured himself or others because of his intoxication. Even if that were not the case, we should have enough concern about the safety and well being of our employees not to put them in the position of doing something so dangerous as driving a motorcycle on the street late at night while drunk....

> As a person who is left in charge of a shift you need to exercise better judgement [sic] if you want to remain in your position.

In the wake of the Randall incident, rumors circulated at the Granite City plant regarding why John Randall was not discharged after showing up for work intoxicated. On July 10, 2000, Heidtman posted

a memorandum regarding the incident and the company's Substance Abuse Policy on the employee bulletin board (Exh. N to Doc. 48). The memorandum, posted on the bulletin board on July 10, 2000, did not mention Broadwater's name.

The memorandum stated that the employee involved was not terminated, because his supervisor gave him an alternative to taking the drug test. The memorandum noted that the alternative offered by the supervisor was not authorized under the Substance Abuse Policy (*id.*):

> As you know, our Substance Abuse Policy indicates that employees will be required to submit to drug and or alcohol testing if an employee reports to work in a condition giving a supervisor reasonable cause to suspect the influence of alcohol. Employees who refuse to cooperate with the testing will be terminated.
>
> In this incident, it was wrong for the supervisor to give the employee the option of going home.... Since the supervisor did this, however, we cannot take disciplinary action against an employee for doing what a supervisor gave him the option of doing.
>
> It is important for employees to know that this is not the way similar situations will be handled in the future. Employees should know that going forward, we will not tolerate employees showing up on Company premises under the influence of alcohol or drugs and the policy will be followed. They will be required to pass a drug/alcohol test or they will be subject to disciplinary action up to and including termination.

In mid-August 2000, Heidtman Steel hired an outside lawyer to speak to plant supervisors regarding what they could say to employees about a union organization campaign which had begun at the Granite City facility. The lawyer spoke to Broad-water at the end of his shift in the early morning hours of August 16, 2000 and provided Broadwater two sheets of paper outlining what supervisors could and could not say regarding unions. Later the same day, Heidtman employee Danny Knight advised Heidtman that Broadwater, without explicitly mentioning the word "union," had said that someone would be "handing out cards," and "it would be in my best interest to sign" the card (Knight Depo., pp. 55, Exh. H to Doc. 48).

When Broadwater reported for his next shift of work (at 10:30 p.m. on August 16, 2000), Plant Superintendent Tim Berra and Plant Manager Darryl Whitner advised him that he was suspended pending an investigation of whether he, a supervisor, had encouraged hourly employees to sign union authorization cards. Berra and Whitner handed Broadwater a letter (Exh. Q to Doc. 48) instructing him to not talk with any Heidtman employee or enter Heidtman property pending the outcome of the investigation. The letter, signed by Darryl Whitner as Plant Manager, stated: "Should you need to speak to someone with the Company, you are instructed to contact me" (*id.*).

Within a day or two after being suspended, Broadwater received a phone call at home from Heidtman employee Mark Seago. Although Broadwater was aware he was not supposed to speak with company employees during the August 2000 suspension, he did not terminate the phone call, because (a) he thought it would be rude, and (b) Seago initiated the phone call (Broadwater Depo., pp. 136–137, Exh. C to Doc. 48). During the suspension, Broadwater also talked with his son, a Heidtman Steel employee, and he talked to Heidtman employees whom he "bumped into" in grocery stores or at soccer games (*id.*, pp. 137–138).

The day following the suspension, Broadwater (in his own vehicle) followed a car containing Heidtman employees Rodney Daniels and Danny Knight home from work. When Daniels stopped the car at Knight's house to allow Knight to exit the vehicle, Broadwater pulled up and spoke to Knight. Broadwater asked Knight how things were going at the plant and made other general conversation for about fifteen minutes (Broadwater Depo., pp. 351–352). As soon as Broadwater left, Knight called Heidtman and reported that Broadwater had followed him home and talked to him. Later, Knight provided an affidavit regarding the August 17, 2000 conversation with Broadwater.

On August 21, 2000, Tim Berra and Darryl Whitner telephoned Broadwater. During the telephone conversation, Berra asked Broadwater if he had spoken to any Heidtman employees. Broadwater responded that it was none of their f——ing business whom he talked to and hung up on Berra and Whitner (Broadwater Depo., p. 98). Broadwater never attempted to contact Whitner after that point (*id.*).

On August 23, 2000, Broadwater received a letter of termination from Heidtman Steel (*id.*). Dated August 22, 2000, the letter (Doc. T to Exh. 48) informed Broadwater as follows:

Recently, we received a report that you were encouraging one or more Heidtman employees to support unionization efforts by signing union authorization cards. Such actions on the part of a supervisor are in violation of the National Labor Relations Act and Company policy. . . .

On Wednesday August 16, 2000, you were placed on suspension pending the outcome of the investigation. At that time, you were told *specifically* not to talk to or communicate with any Heidtman employee while the investigation was underway. Despite that instruction, it was reported that you contacted one or more Heidtman employees during the investigation, asked questions about the investigation, and threatened to sue anyone who was involved. . . .

This is to notify you that we have finished the investigation, and based on your actions, the Company has decided to terminate your employment effective immediately. . . .

Broadwater filed two EEOC charges regarding his employment at Heidtman (Exhs. 1 and 2 to Doc. 31). First, on November 17, 1999, Broadwater submitted a charge alleging that Heidtman had discriminated against him based on his age and appearance, retaliated against him, showed favoritism to other employees (James Jarman and John Randall), and had harassed him (giving him extra duties not given to other supervisors, etc.).[3] On December 7, 1999, the EEOC issued a "Dismissal and Notice of Rights" form (Exh. V to Doc. 48) stating that the EEOC was unable to conclude that the "information obtained establishes violations of the statutes." The December 7, 1999 notice advised Broadwater that he must file any federal lawsuit based on the allegations contained in the November 17, 1999 EEOC charge within 90 days. Broadwater did *not* file suit within 90 days of receiving the December 7, 1999 right-to-sue notice.

---

**3.** Neither the copy of the November 1999 EEOC charge attached to Broadwater's Second Amended Complaint nor the copy of the November 1999 EEOC charge provided with Defendants' summary judgment materials (Exh. U to Doc. 48) includes the page containing the date and claimant's signature. But, with his materials opposing summary judgment, Broadwater provided a copy of the first EEOC charge (Exh. 6 to Doc. 60) which contains the signature page and shows a date of 11/17/99.

On September 7, 2000, Broadwater filed a second EEOC charge. That charge referenced two particular acts by Heidtman (the August 16th suspension and the August 22nd discharge) and alleged that Heidtman took these actions based on Broadwater's "age and race," the fact that he was a "prior whistleblower" at the plant, and "in direct retaliation for recent + past incidents at the plant" (Exh. 2 to Doc. 31). On September 28, 2000, the EEOC issued a "Dismissal and Notice of Rights" letter informing Broadwater that the agency's investigation had not revealed violations of the relevant statutes, but he had the right to file suit in federal court within 90 days (Exh. X to Doc. 48). Broadwater filed suit in this Court on December 27, 2000.

### IV. *Legal Standard Governing Summary Judgment Motions*

Summary judgment is proper if the pleadings, depositions, interrogatory answers, admissions, and affidavits leave no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining *whether* a genuine issue of material fact exists, the Court views the record in the light most favorable to—and draws all reasonable inferences in favor of—the non-moving party.

Because the primary purpose of summary judgment is to isolate and dispose of factually unsupported claims, the nonmovant may not rest on the pleadings but must respond, with affidavits or otherwise, setting forth specific facts showing that there is a genuine issue for trial. *Oest v. Illinois Department of Corrections*, 240 F.3d 605, 610 (7th Cir.2001). The nonmovant must do more than demonstrate some factual disagreement between the parties. *Logan v. Commercial Union Ins. Co.*, 96 F.3d 971, 978 (7th Cir.1996). The issue in dispute must be material. Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute. *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir.2001).

Stated another way, only disputes that could affect the outcome of the suit under governing law properly preclude the entry of summary judgment. *Outlaw* at 837, *citing McGinn v. Burlington Northern R.R. Co.*, 102 F.3d 295, 298 (7th Cir.1996). *See also Anderson*, 477 U.S. at 249, 106 S.Ct. 2505 (A factual dispute is "genuine" only when there is sufficient evidence favoring the nonmoving party for a jury to return a verdict in his favor.).

The Court of Appeals for the Seventh Circuit has repeatedly remarked that the summary judgment standard is applied "with added rigor" in employment discrimination cases. *See, e.g., McCoy v. WGN Continental Broadcasting Co.*, 957 F.2d 368, 370–71 (7th Cir.1992); *Courtney v. Biosound, Inc.*, 42 F.3d 414, 418 (7th Cir. 1994); *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1396 (7th Cir.1997). More recently, however, the Seventh Circuit clarified that there is not a separate, more stringent standard governing employment cases. Instead, this phrase merely reflects "the fact that employment discrimination cases typically involve questions of intent and credibility." *Alexander v. Wisconsin Dept. of Health and Family Services*, 263 F.3d 673, 680–81 (7th Cir.2001).

### V. *Analysis*

#### A. *ADEA and Title VII Claims that are Time–Barred*

The Age Discrimination in Employment Act, 29 U.S.C. § 623(a), prohibits employers from discriminating against individuals on the basis of their age. *Horwitz v. Board of Educ. of Avoca School District No. 37*, 260 F.3d 602, 610 (7th Cir.2001). Title VII, 42 U.S.C. § 2000e–2(a)(1), for-

bids employers from engaging in actions that "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *Berry v. Delta Airlines, Inc.,* 260 F.3d 803, 808 (7th Cir.2001).

■ Both Title VII and the ADEA delineate certain prerequisites which an individual must satisfy before he may institute a lawsuit. For instance, an aggrieved employee in Illinois must file a charge with the EEOC within 300 days of the time that his action began to accrue. 42 U.S.C. § 2000e–5(a); 29 U.S.C. § 626(d)(2). An employee's action accrues when he discovers that he has been injured, not when he determines that the injury was unlawful. *Thelen v. Marc's Big Boy Corp.,* 64 F.3d 264, 267 (7th Cir.1995).

■ Additionally, to maintain a claim under Title VII, an individual who has obtained a right-to-sue letter from the EEOC must file a complaint in federal court within 90 days of receipt of the letter. 42 U.S.C. § 2000e–5(b), (e), (f); *Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 47, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974). *See also EEOC v. Harris Chernin, Inc.,* 10 F.3d 1286, 1288 n. 3 (7th Cir.1993)("to maintain a claim under Title VII, a plaintiff must file charges with the EEOC, receive a Right–To–Sue Letter, and act upon it. . . . If these jurisdictional elements are not met, the action will be dismissed."). These administrative requirements are "conditions precedent," similar to statutes of limitations, which are subject to equitable modification. *Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 393, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982); *Perkins v. Silverstein,* 939 F.2d 463, 469–70 (7th Cir. 1991).

■ Similarly, the ADEA provides that if an employment discrimination charge is dismissed or otherwise terminated by the EEOC, "the Commission shall notify the person aggrieved," and any civil action must be brought by that person "against the respondent named in the charge within 90 days after the date of the receipt of such notice." 29 U.S.C. § 626(e). *See also Noreuil v. Peabody Coal Co.,* 96 F.3d 254, 257 (7th Cir.1996). The 90–day period begins to run when the claimant *receives* the right-to-sue letter. *See Zugay v. Progressive Care, S.C.,* 180 F.3d 901, 902 (7th Cir.1999); *Houston v. Sidley & Austin,* 185 F.3d 837, 838–39 (7th Cir.1999).

In the case at bar, Defendants assert that certain allegations contained in Broadwater's complaint are time-barred, because (a) although Broadwater included them in his initial EEOC charge, he failed to file suit on that charge within 90 days after receiving his right-to-sue letter from the EEOC, and (b) although Broadwater later filed a second EEOC charge, it only encompasses actions within the 300 days preceding the filing of the charge. Resolution of this issue requires analysis of Broadwater's two EEOC charges, two right-to-sue letters, and initial complaint filed in this Court (on December 27, 2000).

In this Court, Broadwater alleges that his November 1, 1999 suspension constituted age discrimination, violative of the ADEA, and retaliation, violative of Title VII. For instance, in Count I (the ADEA count), at ¶ 15, Broadwater alleges that younger, less experienced employees were promoted to his position following Broadwater's 1999 suspension. Likewise, in Count II (the Title VII count), Broadwater alleges that upon *returning to work in November 1999* following his suspension on November 1, 1999, he was subjected to harassment and denied promotions (Count II, ¶ 21).

Heidtman suspended Broadwater on November 1, 1999. Broadwater filed his first EEOC charge on November 17, 1999.

He received a right-to-sue letter on that charge on December 7, 1999. Broadwater did not file suit within 90 days of receiving that letter.

Broadwater filed a second EEOC charge on September 7, 2000 and received a right-to-sue letter on that charge on or about September 30, 2000. He filed suit within 90 days of receiving the September 2000 right-to-sue letter.[4] Therefore, the suit before this Court encompasses actions taken by Defendants within 300 days prior to September 7, 2000 (the date Broadwater filed the EEOC charge from which he timely filed suit herein). 300 days before September 7, 2000 is November 12, 1999.

Clearly, allegations regarding conduct relating to the November 1, 1999 suspension, presented in Broadwater's December 27, 2000 complaint in this Court, would be time-barred—unless they are saved by an equitable doctrine. The law of this Circuit recognizes several such doctrines, and Broadwater seeks to avail himself of two of them.

■ First, the "continuing violation doctrine" allows a plaintiff to obtain relief for time-barred acts by linking them with acts falling within the limitations period. *See Selan v. Kiley*, 969 F.2d 560, 564 (7th Cir.1992). Courts treat the combination of timely and time-barred acts as "one continuous act that ends within the limitations period." *Shanoff v. Illinois Dept. of Human Services*, 258 F.3d 696, 703 (7th Cir. 2001). Although often allowing a plaintiff to find refuge in the continuing violation theory on a hostile environment claim, the Seventh Circuit generally rejects such relief for allegations regarding a specific ac-

tion like a firing, a suspension, or a refusal to promote—*i.e.*, defined acts that happen on a particular date. *See id.*

■ As the Seventh Circuit noted in *Shanoff*, to avail himself of the continuing violation theory: "the plaintiff must ... demonstrate that ... the harm about which [he] is complaining is part of a pattern of conduct, and [he] 'was reasonable not to perceive [his] working conditions as intolerable until the acts of harassment had, through repetition or cumulation, reached the requisite level of severity.'" *Id.* at 703, *citing Russell v. Board of Trustees of the Univ. of Ill. at Chicago*, 243 F.3d 336, 343 (7th Cir.2001), and *DeClue v. Central Ill. Light Co.*, 223 F.3d 434, 435–36 (7th Cir.2000).

■ Here, Broadwater has not demonstrated that his allegations regarding the November 1, 1999 suspension were part of a pattern of conduct which he did not perceive as discriminatory until later acts of harassment revealed them to be such. Obviously, Broadwater immediately perceived a discriminatory aspect to the November 1st suspension, as he filed an EEOC charge less than three weeks later. *See Miller v. American Family Mutual Ins. Co.*, 203 F.3d 997, 1003–04 (7th Cir.2000)(recognizing three variations of the continuing violation doctrine but reiterating that "if the plaintiff knew ... after each act that it was discriminatory and had harmed her, she must sue over that act within the relevant statute of limitations"). So, the continuing violation theory does not apply to the allegations regarding the November 1, 1999 suspension of Broadwa-

---

4. Broadwater alleges (Second Amended Complaint, p. 4, ¶ 12), and Defendants have not disputed, that the suit commenced in this Court on December 27, 2000 was filed within 90 days of Broadwater receiving his September 2000 right-to-sue notice. Although Broadwater has not directly cited the Court to proof in the record as to the date he received the second EEOC right-to-sue notice, the notice itself (Exh. X to Doc. 48) is dated September 28, 2000. It is quite reasonable to believe that Broadwater received the notice two days later, on September 30, 2000, as alleged.

ter or any other conduct of which Broadwater complained in his November 17, 1999 EEOC charge which occurred prior to November 12, 1999.

 Second, Broadwater relies on the doctrine of equitable estoppel. Also known as fraudulent concealment, the doctrine of equitable estoppel applies if a defendant/employer takes active steps to prevent a plaintiff/employee from suing within the limitations period. *Jackson v. Rockford Housing Authority*, 213 F.3d 389, 394 (7th Cir.2000). Active steps include hiding evidence or promising to not plead the statute of limitations. *Shanoff*, 258 F.3d at 702, *citing Jackson*, 213 F.3d at 394. Stated another way:

> Under the doctrine of equitable tolling, a limitations period may be suspended "when the prospective plaintiff simply does not have and cannot with due diligence obtain information essential to bringing a suit."

*Anderson v. Board of Regents of the Univ. of Wisconsin System*, 140 F.3d 704, 706 (7th Cir.1998).

 Equitable estoppel will not be applied, however, if the plaintiff retained the ability to obtain the information necessary to pursue his claim, notwithstanding the defendant's delay or resistance. *Id.* Indeed, equitable tolling "should be exercised only sparingly," and not where the "claimant failed to exercise due diligence in preserving his legal rights." *Tyler v. Runyon*, 70 F.3d 458, 465 n. 8 (7th Cir. 1995).

 In his memorandum opposing summary judgment (at p. 2), Broadwater claims that Defendants attempted to prevent him from filing suit following the November 1, 1999 suspension. Broadwater asserts that by reinstating him to his job, granting him back pay for all but four days of the period of suspension, and advising him that the situation between him and Whitner "would work," Defendants led

him to believe that his problems had been amicably resolved, "and there would be no necessity for legal action."

Unfortunately, Broadwater cites no deposition excerpts, affidavits, or documentary material whatsoever to buttress these assertions. The Court has undertaken a careful, time-consuming effort to wade through the volumes of materials produced by both counsel herein and is well aware that, in determining whether a genuine issue of material fact exists, it must view all facts and reasonable inferences in the light most favorable to Broadwater.

The problem is Broadwater—throughout his entire 48–page memorandum opposing summary judgment—cites no evidence to support these arguments regarding conduct by Defendants which might be construed to equitably estop Defendants from now arguing that Broadwater's claims are time-barred. Broadwater has presented arguments and speculation only—no evidence in opposition to summary judgment—that Defendants took active steps to prevent Broadwater from timely filing a lawsuit based on the claims relating to the November 1999 suspension.

Accordingly, the Court finds that, in this lawsuit commenced on December 27, 2000, Broadwater may not advance any claims relating to the November 1999 suspension or the other conduct listed in his November 17, 1999 EEOC charge which occurred before November 12, 1999. Those claims are time-barred. The claims cognizable herein relate to conduct occurring within 300 days prior to the date Broadwater filed his *second* EEOC charge (on September 7, 2000), since Broadwater did file suit within 90 days of receiving the right-to-sue letter from the EEOC on that second charge. Defendants are entitled to summary judgment on all claims relating to conduct occurring *more than* 300 days before the date Broadwater filed his second EEOC charge on September 7, 2000.

### B. *Claims Not Raised in Broadwater's 9–7–2000 EEOC Charge*

■ The law of this Circuit plainly holds that the scope of an EEOC charge limits the scope of the subsequent federal court complaint. *See, e.g., Babrocky v. Jewel Food Co. & Retail Meatcutters*, 773 F.2d 857, 863 (7th Cir.1985). Stated simply, this rule holds: "Generally, a Title VII plaintiff may bring only those claims that were included in her EEOC charge." *McKenzie v. Illinois Department of Transportation*, 92 F.3d 473, 481 (7th Cir. 1996).

The reason for the rule is simple:

An aggrieved employee may not complain to the EEOC of only certain instances of discrimination, and then seek judicial relief for different instances of discrimination. This limitation is consistent with the principle of primary jurisdiction in the agency, for it gives the employer some warning of the conduct about which the employee is aggrieved, and it affords the agency and the employer an opportunity to attempt conciliation without resort to the courts.

*Rush v. McDonald's Corp.*, 966 F.2d 1104, 1110 (7th Cir.1992).

The Seventh Circuit consistently has reiterated the policy against allowing an employment discrimination complaint to encompass allegations outside the ambit of the predicate EEOC charge. The Court has announced a test for delineating whether an EEOC charge sufficiently embraces the claims raised in a later-filed complaint:

all Title VII claims set forth in a complaint are cognizable that are "like or reasonably related to the allegations of the charge and growing out of such allegations." *Jenkins v. Blue Cross....* [T]he test of *Jenkins* is satisfied if there is a reasonable relationship between the allegations in the charge and the claims in the complaint, and the claim in the complaint can reasonably be expected to grow out of an EEOC investigation of the allegations in the charge.

*Cheek v. Western and Southern Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir.1994).

■ Broadwater's September 7, 2000 EEOC charge (the charge on' which he timely filed suit in this Court) sets forth two specific incidents of discrimination—August 16, 2000 "suspended w/o pay" and August 22–23, 2000 "Terminated"—and then explains: "I believe these actions are in direct retaliation for recent + past incidents at plant, also due to my age and race, and as a prior whistleblower" (Exh. 2 to Doc. 31). Broadwater's December 27, 2000 complaint filed in this Court contains additional allegations, *e.g.*, that Broadwater was "denied access to advancement, promotion and increased pay" (Doc. 31, Count I, ¶ 18).

Claims of denied promotions and pay raises are neither like nor reasonably related to the allegations of the September 7, 2000 EEOC charge (based on the 8–16–00 suspension and the 8–22–00 termination). Nor can the promotion and pay raise claims reasonably have been expected to "grow out of an EEOC investigation" of the 8–16–00 suspension or the 8–22–00 termination.[5] Therefore, any claims of de-

---

**5.** The Court is not persuaded by Broadwater's suggestion that the promotion and pay raise claims are properly part of this lawsuit, because they were referenced in an attachment to the September 2000 EEOC charge. The lengthy attachment complains of actions taken by Defendants for the four years *preceding* November 1, 1999. Many of these claims would be time-barred. The attachment which Broadwater cites is a *copy* of a detailed explanation provided with the November 1999 EEOC charge. A claimant/plaintiff cannot renew time-barred claims from a prior EEOC charge by simply attaching them to a fresh EEOC charge.

nied promotions, pay raises, and "access to advancement" are not cognizable herein, as they were not properly part of the September 7, 2000 EEOC charge on which suit was brought.

### C. The ADEA Claim (Count I of Second Amended Complaint)

In Count I of his complaint, Broadwater alleges that he was 53 years old at the time he was discharged from his employment, that he was discharged despite the fact he performed his job satisfactorily, that during his employment with Heidtman he was "discriminated against because of his age," and that "his employment was terminated in part due to age discrimination," all in violation of the ADEA. As noted above, the ADEA prohibits employers from discriminating against employees on the basis of their age. 29 U.S.C. § 623(a).[6]

■■■ To succeed on a discrimination claim under the ADEA, a plaintiff must show that his termination or other adverse employment action would not have occurred "but for" his employer's motive to discriminate on the basis of age. *Horwitz*, 260 F.3d at 610, *citing Fuka v. Thomson Consumer Elecs.*, 82 F.3d 1397, 1402 (7th Cir.1996). Age discrimination can be proved through either the direct method or the indirect burden-shifting method of proof outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Here, as to the claims on which suit was timely filed (*i.e.*, the claims relating to Broadwater's August

16, 2000 suspension and his August 22, 2000 employment termination), Broadwater must proceed via the indirect method.[7]

■■■ Under this approach, the plaintiff first must establish a prima facie case of discrimination. *Horwitz*, 260 F.3d at 610, *citing Adreani v. First Colonial Bankshares Corp.*, 154 F.3d 389, 394 (7th Cir. 1998). To build a successful prima facie case, Broadwater must show that:

(1) he falls within the protected age group—*i.e.*, he is at least 40 years old;

(2) he performed his job satisfactorily;

(3) he suffered a materially adverse employment action; and

(4) younger employees situated similarly to him were treated more favorably.

*Id.*[8] *Accord Rummery v. Illinois Bell Telephone Co.*, 250 F.3d 553, 556 (7th Cir. 2001)("In order to set forth a prima facie case of age discrimination under the ADEA, a plaintiff must show: (1) he was 40 or older, (2) he was performing his job satisfactorily, (3) he was discharged, and (4) substantially younger, similarly situated employees were treated more favorably.").

If the employee establishes a prima facie case, a presumption of discrimination arises, and the burden shifts to the employer to articulate a non-discriminatory reason for its materially adverse employment action. *Horwitz*, 260 F.3d at 610. *Accord Wade v. Lerner New York, Inc.*, 243 F.3d 319, 322 (7th Cir.2001)("If a plaintiff is able to meet this initial burden,

---

**6.** An employee must be at least 40 years old to pursue an age discrimination claim. 29 U.S.C. § 631(a).

**7.** Broadwater contends that he can present *direct* evidence of age discrimination as to his claim that Heidtman failed to promote him to the Day Shift Supervisor position, but this Court already has found that claim is time-barred (the acts complained of occurred in

1996) and/or was not timely presented via the September 7, 2000 EEOC charge which limits the scope of this lawsuit.

**8.** "The Supreme Court has clarified that an ADEA plaintiff who shows that he was replaced by someone substantially younger need not prove that the replacement is outside the protected class." *Horwitz* at 610, *quoting Adreani*, 154 F.3d at 394.

then the burden shifts to the defendant to provide 'evidence of a legitimate and non-discriminatory reason for the employment decision.' "). If the employer satisfies this showing, then the employee can prove by a preponderance of evidence that the legitimate reasons offered by the employer were not its true reasons, but were pretext for discrimination. *Wade*, 243 F.3d at 322, citing *Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 983 (7th Cir.1999).[9]

■ Turning to the prima facie case, Broadwater has presented evidence satisfying the first and third prongs—*i.e.*, he is 40 years of age or older and he suffered a materially adverse employment decision (discharge). Broadwater has not demonstrated, however, that he was performing his job satisfactorily, the second prong of the prima facie case. This prong requires the employee to prove that he was performing up to the legitimate expectations of his employer.

In the context of Defendants' summary judgment motion, the Court views the record in the light most favorable to Broadwater. Broadwater insists that he was performing well in the workplace. Specifically, Broadwater states that he "always received very good performance reviews from defendants" (Doc. 58, ¶ 65). But the only performance reviews he offers to support that sweeping statement are for the period 8/4/93 to 7/29/94 and the period 6/1/94 to 6/1/95 (Exh. 20 to Doc. 60). These two evaluations predate his discharge by over 4 years.

Plus, the Seventh Circuit has rejected the "blanket proposition that every plaintiff who claims that his or her work performance was satisfactory meets *McDonnell Douglas'* second element." *See Oates v. Discovery Zone*, 116 F.3d 1161, 1172 (7th

Cir.1997). Only reasonable inferences are to be drawn from the record, and it is not enough for an employee to offer his own, unsupported recitation of events. Rather, he must present "specific facts showing that there is a genuine issue for trial." *Gleason v. Mesirow Financial, Inc.*, 118 F.3d 1134, 1139 (7th Cir.1997).

The record before this Court indicates that Broadwater was *not* performing up to Heidtman's legitimate expectations. The company received numerous complaints regarding Broadwater's actions while he was a supervisor, particularly in the last month or two of his employment. Accepting as true Broadwater's version of the events surrounding the July 4, 2000 incident in which employee John Randall showed up for work intoxicated (*i.e.*, that instead of giving Randall the *option* of taking a drug/alcohol test or going home, Broadwater simply advised Randall "if he persisted in staying on the property that he must take a alcohol test" (Doc. 58, ¶ 36)), Heidtman certainly had grounds for displeasure with Broadwater's handling of the incident.

Additionally, Heidtman was disappointed in Broadwater's behavior during the August 2000 suspension (during the investigation into whether Broadwater, a supervisor, had engaged in "pro-union activity"). Accepting as true Broadwater's version of the events leading up to that suspension, even if the suspension itself was unnecessary or unfounded, Broadwater admits that he was instructed to not speak to any Heidtman employees while suspended. He chose to disregard that instruction, because he believed it to be "unreasonable" and "illegitimate" (Doc. 58, ¶ 55). The record plainly shows that Broadwater violated this directive and had contact with

---

9. In establishing pretext, it is not enough for the employee to show that his employer fired him for incorrect or poorly considered reasons. "He must establish that the employer

did not honestly believe the reasons it gave for terminating him." *Wade*, 243 F.3d at 323, quoting *Pitasi v. Gartner Group, Inc.*, 184 F.3d 709, 718 (7th Cir.1999).

other Heidtman employees. When directly asked by Tim Berra and Darryl Whitner if he had been talking to Heidtman employees during his suspension, Broadwater responded that it was "none of their f-ing" business whom he talked to (Broadwater Depo., pp. 97–98). The company interpreted this behavior as insubordinate; understandably so. In the face of this evidence, Broadwater cannot establish that he was performing up to Heidtman's legitimate expectations.

 Nor can the Court conclude that Broadwater has met the fourth prong of his ADEA prima facie case—that younger, *similarly situated* employees were treated more favorably than he. Because Broadwater has not met his burden of proof as to the prima facie case of age discrimination, the Court need not reach the issue of whether Heidtman had a legitimate, non-discriminatory reason for suspending and discharging Broadwater. Broadwater has failed to establish a prima facie case of age discrimination, no genuine issues of material fact exist as to this claim, and Defendants are entitled to summary judgment on Count I.

D. *The Title VII Claims (Count II of Second Amended Complaint)*

In Count II of his complaint, Broadwater alleges that he was harassed, suspended without cause, and ultimately terminated because: he is a white male, he was caught on a "secret" recording making a racial comment allegedly referring to his supervisor, Darryl Whitner (a black male), and that incident caused "racial animus" which eventually resulted in his suspension and termination from employment at Heidtman. The Court uses Broadwater's term for this Title VII claim—the "reverse race discrimination" claim. Count II also alleges that Heidtman retaliated against him (suspending him and ultimately discharging him) "at least in part, as a result of his filing of an EEOC complaint" (Second Amended Complaint, Count II, ¶ 22).

 A plaintiff alleging race discrimination under Title VII can prove such discrimination either by providing direct evidence of an employer's discriminatory intent or by showing disparate treatment using indirect evidence and the burden-shifting method established in *McDonnell Douglas Corp. v. Green. See Contreras v. Suncast Corp.*, 237 F.3d 756, 759 (7th Cir.), cert. denied, —— U.S. ——, 122 S.Ct. 62, 151 L.Ed.2d 29 (2001). Likewise, a claim of retaliation under Title VII can be proven by either offering direct evidence of retaliation or proceeding under a burden-shifting approach. *Alexander*, 263 F.3d at 682.

**(1.) THE TITLE VII "REVERSE RACE DISCRIMINATION" CLAIM**

 In the case at bar, Broadwater has presented no direct evidence that he was the victim of reverse race discrimination, so we turn to the indirect or burden-shifting method. In the normal Title VII race discrimination case, to establish a prima facie case under the burden-shifting method, a Title VII plaintiff must show that (1) he belongs to a protected class, (2) he performed his job according to his employer's legitimate expectations, (3) he suffered an adverse employment action, and (4) similarly situated employees outside the protected class (of a different race) were treated more favorably. *Logan v. Kautex Textron North America*, 259 F.3d 635, 639 (7th Cir.2001).

 Because Broadwater is a white male, he obviously could not satisfy the first prong of the prima facie test. Indeed, the Seventh Circuit has noted that, if strictly applied, the prima facie test would eliminate all reverse discrimination suits. *See Mills v. Health Care Service Corpora-*

*tion,* 171 F.3d 450, 454 (7th Cir.1999). For this reason, the Seventh Circuit has developed a flexible approach to such suits, declaring it well settled that "the protections of Title VII are not limited to members of historically discriminated-against groups." *Id., citing McDonald v. Santa Fe Trail Transp. Co.,* 427 U.S. 273, 280, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976); and *Greenslade v. Chicago Sun–Times, Inc.,* 112 F.3d 853, 863 (7th Cir.1997). Therefore, in a "reverse" race discrimination case, the plaintiff must satisfy a modified prima facie test.

Prongs two, three, and four remain the same, but for prong one the plaintiff must present "background circumstances" that support an inference that the defendant "is one of those unusual employers who discriminates against the majority." *Mills,* 171 F.3d at 455. The contours of what constitutes "background circumstances" are not precise, but two categories of circumstances offer guidance: (1) evidence indicating that the particular employer at issue has some reason or inclination to discriminate invidiously against whites; and (2) evidence indicating that there is something "fishy" about the facts of the case at hand. *Id.* Examples of the latter category include evidence of schemes to fix performance ratings to the detriment of white employees and evidence that white employees were passed over despite superior qualifications. *Id.*

 The Court now determines whether prong one has been satisfied in this case. Having carefully scoured the abundant record before it, the Court concludes that Broadwater has presented no evidence that Heidtman had the inclination to invidiously discriminate against whites and no evidence that there is something fishy about the facts surrounding the employment decisions in issue (the August 2000 suspension and termination of Broadwater).

Primarily, Broadwater points to Heidtman and Whitner's treatment of John Randall, a black employee. Broadwater suggests that, following the incident in which Randall appeared for work intoxicated and left the plant without submitting to an alcohol/drug test, Whitner advised Broadwater that "the company could not do anything to him [Randall] because he is black" (Plaintiff's Memorandum Supporting Summary Judgment, at p. 25). Even assuming it true that Whitner actually made this statement, Broadwater overlooks the fact that Heidtman *did* "do something" to Randall—he was firmly disciplined for appearing intoxicated (suspended for five days without pay). And the record amply supports Defendants' position that they did not *discharge* Randall, because he was allowed to go home rather than submit to an alcohol/drug test.

As to Broadwater's assertion that Randall was allowed to keep his job despite having poor attendance and becoming involved in a fight at the workplace, the record before the Court discloses that a white employee (Mark Seago) also was allowed to keep his job despite poor attendance and involvement in an altercation at the plant. In short, Broadwater has not satisfied the first element of his prima facie race discrimination case. For all the reasons discussed above in section C, the Court further concludes that Broadwater has not met the second prong of the prima facie race discrimination case either—performing up to his employer's legitimate expectations.

Broadwater has not demonstrated a prima facie case of race discrimination, no genuine issues of material fact remain as to the race discrimination claims, and Defendants are entitled to judgment as a matter of law thereon.

### (2.) THE TITLE VII RETALIATION CLAIM

In addition to protecting against discrimination on the basis of race and sex, Title VII prohibits employers from retaliating against employees who contest allegedly discriminatory acts. 42 U.S.C. § 2000e–3 provides:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

Thus, it is said that Title VII's anti-retaliation provision protects two types of activities, "opposition conduct" and "participation conduct." *Speedy v. Rexnord Corp.*, 243 F.3d 397, 404 (7th Cir.2001).

A Title VII plaintiff may proceed via direct evidence of retaliation or the familiar burden-shifting approach. *Contreras*, 237 F.3d at 759. Direct evidence "usually takes the form of an acknowledgment of discriminatory intent by the employer." *Fyfe v. City of Fort Wayne, Indiana*, 241 F.3d 597, 601 (7th Cir.2001), *citing Kennedy v. Schoenberg, Fisher & Newman, Ltd.*, 140 F.3d 716, 722–23 (7th Cir.), *cert. denied*, 525 U.S. 870, 119 S.Ct. 167, 142 L.Ed.2d 136 (1998). In the absence of direct evidence of retaliation, a Title VII plaintiff must prove his case via the burden-shifting method, the first step of which is to establish a prima facie case of retaliation.

A prima facie case of retaliation is established when a plaintiff shows:

(1) he engaged in protected activity under Title VII;

(2) he suffered an adverse employment action subsequent to his participation; and

(3) there exists a causal connection between the adverse employment action and his participation in protected activity.

*Oest*, 240 F.3d at 615–16. *Accord Eiland v. Trinity Hospital*, 150 F.3d 747, 753 (7th Cir.1998). Once the plaintiff has established a prima facie case, the burden shifts to the employer to put forth a legitimate, nondiscriminatory reason for its actions. Then, the burden shifts back to the plaintiff to show that the employer's articulated reason is a pretext for unlawful discrimination. *Fyfe*, 241 F.3d at 602.

So, to survive summary judgment, Broadwater must demonstrate that he engaged in statutorily protected expression, he suffered an adverse employment decision, and there is a causal link between the two. *See Logan*, 259 F.3d at 640. Broadwater filed a discrimination charge with the EEOC prior to the company's August 2000 actions of which he complains, *i.e.*, the November 17, 1999 EEOC charge. The filing of that charge constitutes "protected activity" under Title VII. *See Smart v. Ball State University*, 89 F.3d 437, 440–41 (7th Cir.1996).

Defendants challenge whether Broadwater truly engaged in statutorily protected expression by filing the November 1999 EEOC charge, arguing that Broadwater lacked a good faith belief that he was opposing practices truly prohibited by Title VII or the ADEA (*see* Doc. 48, p. 18). The Court rejects this argument and concludes that Broadwater has satisfied the first element of his retaliation prima facie case. An employee engages in statutorily protected activity by filing an EEOC charge, even if the harassment he complains of does not actually violate Title

VII. *Filipovic v. K & R Express Systems, Inc.*, 176 F.3d 390, 398 (7th Cir.1999).

■ Heidtman suspended and, later, discharged Broadwater. Those events qualify as adverse job actions and satisfy the second element of the retaliation prima facie case. *See Smart*, 89 F.3d at 441 ("Adverse employment action has been defined quite broadly in this circuit. . . . [F]or example, when an employee is fired, or suffers a reduction in benefits or pay, it is clear than an employee has been the victim of an adverse employment action.").

■ Broadwater encounters a snag, however, on the third element of the prima facie case—the needed causal link between the employee's protected activity and the employer's adverse job action. To meet the causal link requirement, Broadwater must demonstrate that Heidtman would not have taken the adverse action "but for" his protected activity. *Adusumilli v. City of Chicago*, 164 F.3d 353, 363 (7th Cir.), *cert. denied*, 164 F.3d 353 (1998); *McKenzie v. Illinois Dept. of Transportation*, 92 F.3d 473, 483 (7th Cir.1996).

The law of this Circuit recognizes that a Title VII plaintiff may establish a causal connection between protected activity and adverse employment action through evidence that the discharge took place "on the heels of" the protected activity. *See Dey v. Colt Construction & Development Co.*, 28 F.3d 1446, 1458 (7th Cir.1994); *Hunt–Golliday v. Metropolitan Water Reclamation District of Greater Chicago*, 104 F.3d 1004, 1015 (7th Cir.1997). In the instant case, though, Broadwater filed his EEOC charge on November 17, 1999. That is approximately nine months before the August 16, 2000 suspension and the August 22, 2000 discharge which Broadwater claims are retaliatory. In the context of the facts of this case, that period is too attenuated to support the inference of a causal link. *See Oest*, 240 F.3d at 615–16 (In analyzing retaliation claims, "a sub-stantial time lapse . . . is counter-evidence of any causal connection.").

The Seventh Circuit has instructed, in the context of the retaliation prima facie case:

> The inference of causation weakens as the time between the protected expression and the adverse action increases, and then "additional proof of a causal nexus is necessary." *Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 511 (7th Cir.1998). Thus, we have permitted retaliation charges to proceed in the face of long intervals only when additional circumstances demonstrate that an employer's acts might not be legitimate. *See McKenzie v. Illinois Dep't of Transp.*, 92 F.3d 473, 485 (7th Cir.1996).

*Oest*, 240 F.3d at 616. In the case at bar, there are no such "additional circumstances" indicating that Heidtman's actions were illegitimate.

Rather, here, as in *Adusumilli*, 164 F.3d at 363, the employee (Broadwater) has failed to show that he was fired in retaliation for his EEOC charge rather than his inability to do his job well. *Id., citing Juarez v. Ameritech Mobile Communications, Inc.*, 957 F.2d 317, 321 (7th Cir. 1992)(the timing of protected activity alone did not create a genuine issue of material fact as to a causal link, when the plaintiff could not prove that she was terminated due to her complaint regarding harassment rather than her poor work performance). Because Broadwater has not established the third element of his retaliation prima facie case, his retaliation claim fails, and the Court need not decide whether Heidtman has proven that it had a legitimate, nondiscriminatory reason for suspending and discharging Broadwater. Defendants are entitled to summary judgment on Count II.

### E. The State Law Claims

Counts III and IV of Broadwater's Second Amended Complaint allege intentional infliction of emotional distress and violations of the Illinois Eavesdropping Act, 720 ILCS 5/14–1, *et seq.* These claims are based solely on state (Illinois) law. The Court, in this Order, has dismissed or granted summary judgment in favor of Defendants on all of Broadwater's federal claims. Pursuant to 28 U.S.C. § 1367(c)(3), the Court may decline to exercise supplemental jurisdiction over Broadwater's remaining, pendent state law claims. "A decision to relinquish pendent jurisdiction before the federal claims have been tried is … the norm, not the exception, and such a decision will be reversed only in extraordinary circumstances." *Contreras*, 237 F.3d at 766, *quoting Disher v. Information Resources, Inc.*, 873 F.2d 136, 140 (7th Cir.1989).

This Court declines to exercise supplemental jurisdiction over the state law claims presented in Counts III and IV of Broadwater's Second Amended Complaint. The Court DISMISSES those claims without prejudice. This dismissal leaves only Count V of the complaint, in which Broadwater simply sought punitive damages for all the conduct alleged in Counts I through IV, his federal *and* state law claims. The portion of Count V requesting punitive damages on the federal ADEA and Title VII claims fails, as Broadwater was unable to make a prima facie case sufficient to survive summary judgment on his ADEA and Title VII claims. The portion of Count V requesting punitive damages on the state law claims (Counts III and IV) shall be dismissed without prejudice.

### VI. Conclusion

For all the reasons delineated above, the Court **GRANTS in part** and **DENIES in part** Defendants' November 20, 2001 summary judgment motion (Doc. 47). The motion is **GRANTED**, and the Clerk of Court is **DIRECTED** to enter judgment in favor of Defendants Heidtman Steel Products, Inc. and Darryl Whitner, as to all of Broadwater's federal employment discrimination claims (Counts I and II of the Second Amended Complaint, plus the part of Count V which sought punitive damages on the federal claims). The motion is **DENIED**, and (declining to exercise supplemental jurisdiction thereon) the Court **DISMISSES without prejudice**, Broadwater's pendent state law claims (Counts III and IV of the Second Amended Complaint, plus the part of Count V which sought punitive damages on the state claims).

**IT IS SO ORDERED.**